PER CURIAM.
John William Kalisz was convicted of two counts of first-degree murder, two counts of attempted first-degree murder, and burglary of a dwelling. Kalisz seeks review of his convictions and sentences of death. We have jurisdiction. See art. V, § 8(b)(1), Fla. Const. On appeal, Kalisz presents seven issues with regard to the penalty phase which led to imposition of the death sentences. However, we review both the evidence of guilt as well as the penalty phase issues actually presented because this Court has an obligation to review the sufficiency of the evidence in all death penalty cases. See Fla. R.App. P. 9.142(a)(5). For the reasons stated below, we affirm his convictions and sentences.
FACTS AND PROCEDURAL HISTORY
On January 14, 2010, Kalisz fatally shot Kathryn Donovan and Deborah Tillotson in Kathryn’s home. Kalisz also shot, though not fatally, Manessa Donovan and Amy Wilson. On February 3, 2010, a grand jury indicted Kalisz for two counts of murder in the first degree, two counts of attempted first-degree murder with a firearm, one count of burglary of a dwelling with a firearm, and one count of possession of a firearm by a convicted felon. Prior to commencement of the trial, Kalisz filed numerous motions, which included a request to suppress his statements to law enforcement. The guilt phase of Kalisz’s trial revealed the following.
On January 13, 2010, Kalisz purchased two magazines for a Beretta handgun, full metal jacket ammunition, and hollow-point ammunition at the Sportman’s Attic. Later that night, around 10 p.m., Kalisz drove to the home of a friend. Kalisz, a longtime member of Alcoholics Anonymous (AA), previously attended meetings with this friend. Kalisz informed his friend that he had an alcoholic beverage with him. The friend found this unusual because he did not believe that Kalisz consumed alcohol. The friend explained that the bottle was sealed, but later Kalisz opened it, consumed some of its contents, and “almost threw up.” The friend described Kalisz as a “wreck” and that he appeared to feel hopeless. He assumed that Kalisz was upset because his mobile home had been recently destroyed by a fire. Later, Kalisz fell asleep and was still present when his friend awoke around 7:30 a.m. the next day.
During the afternoon of January 14, 2010, Kalisz travelled to the location where one of his acquaintances worked. Kalisz was driving a white Ford Aerostar with Colorado license plates. Kalisz requested permission of this acquaintance to fire his weapon on the property. Kalisz showed his acquaintance a black, semi-automatic nine-millimeter handgun, which was fitted with a red dot laser sight. Kalisz fired the *191 weapon five to seven times, and then inquired of his acquaintance if he needed any assistance with his work. The acquaintance declined Kalisz’s offer and then noticed that the laser pointer sight on the weapon was directed at the tree behind him. The acquaintance believed that Kal-isz had “just pointed [the gun] at me” and said he felt threatened. Subsequently, the acquaintance requested that Kalisz leave the property.
That same day, Kathryn (also known as “Kitty”), Manessa (Kathryn’s daughter), Deborah (also known as “Debi”), and Amy were finishing work early at Kathryn’s home.[1] Kathryn operated a business out of her home and employed the other three women. One of Kathryn’s neighbors testified that on that particular afternoon she was walking in the area with her five-year-old daughter when she noticed a white Ford vehicle with Colorado license plates. The neighbor was “concerned” because the vehicle did not have a Florida license plate, and she was unaccustomed to seeing out-of-state vehicles in the neighborhood. She also noticed that the driver was driving the vehicle erratically. The neighbor eventually returned to her home, but permitted her daughter to remain outside. Later, the daughter ran into her home and informed her mother that the police were outside.
When Kalisz arrived at Kathryn’s residence that afternoon, Kathryn was inside the home, and Deborah, Manessa, and Amy were outside. Suddenly, Kathryn screamed and then shouted “what the hell are you doing here?” Thereafter, Manes-sa heard three gunshots and, upon looking through a sliding glass door opening, saw her mother lying face down between a table and some boxes. Kalisz then advanced toward Deborah and Manessa, who at this point were standing beside each other, and shot both women. Manessa, who was shot multiple times, pretended to be dead in an attempt to cause Kalisz to stop shooting her. Kalisz then proceeded toward Amy, who was running away, and kicked her in the foot. Amy, who at this point was on the ground, asked Kalisz “[W]ho are you? ... Why are you doing this? ... I don’t even know-you.” Kalisz then shot Amy twice. Just' as Manessa feigned death, Amy also pretended to be dead to cause Kalisz to stop shooting her. Both Manessa and Amy, who survived the shooting, testified that Kalisz did not speak to them during the incident. Despite her condition,’ Amy was able to dial 911 for help using a phone that she carried in her pocket. Amy informed law enforcement that she and three others had been shot. Upon the arrival of law enforcement, Manessa advised that it was her uncle who had “shot everybody.” Manessa stated that while he was firing the weapon, Kalisz appeared “like he was possessed by a demon,” his eyes were black, and she thought he might be under the influence of drugs.
During trial, Dr. Kyle Shaw, an associate medical examiner who performed the autopsies on both Kathryn and Deborah, discussed the causes of death for both victims. Dr. Shaw recovered multiple projectiles and fragments from both of the victims’ bodies. Dr. Shaw testified that in his opinion, and to a reasonable degree of medical certainty, both women died of multiple gunshot wounds. He testified that the manner of death was homicide.
Kalisz’s friend testified that Kalisz had placed a telephone call to him around 3 p.m. on the day of the murders. Kalisz informed the friend that he had been to his sister’s house and “tak[en] care of a problem,” and that he had taken care of “all of *192 them.” The friend described Kalisz as being in a state of despair, and related that Kalisz had informed him that he did not “feel anything.” Subsequent to this conversation, the friend called for emergency assistance and then drove to Kathryn’s home. Law enforcement requested that Kalisz’s friend go directly to the Hernando County Sheriff’s Office and provide a statement. At the Sheriffs Office, the friend advised officers that Kalisz had “told me last night ... I have got a nine-millimeter, and I have got these clips, and I have got seven clips and I have got more, and, and they are hollow points.... ” When the detective who was conducting the interview asked the friend who Kalisz planned to harm, the friend responded that Kalisz had identified Kalisz’s sister as the target. The friend also informed law enforcement that Kalisz had stated that if anyone tried to stop him, Kalisz would shoot himself and it would not matter if those persons were police officers. The friend also advised law enforcement that after the murders, Kalisz had stated that his sister, Kathryn, had ruined his life, so he ruined hers.
The friend was somewhat evasive at trial during direct examination. He testified that although he had informed law enforcement immediately after the murders that Kalisz had spoken about “taking out” his sister and driving to the Florida Keys, at trial the friend stated that Kalisz “never directly said that to me.” Although the friend did not deny what the transcripts of his interview with law enforcement reflected, he expressed disagreement with the interpretation of his words.
After the shooting of the four women, law enforcement issued a be-on-the-lookout (BOLO) alert for Kalisz’s vehicle; Lieutenant Michael Brannin of the Dixie County Sheriffs Office subsequently identified Kalisz’s vehicle and followed Kalisz to a gas station. Lieutenant Brannin had stopped his patrol car in front of Kalisz’s vehicle and exited when he noticed that Kalisz had a firearm. Thereafter, law enforcement and Kalisz exchanged gunfire. Lieutenant Brannin fired four shots into Kalisz’s vehicle. Kalisz was shot, disarmed, arrested, and transported to Shands Hospital in Gainesville, Florida. During the shoot-out, Kalisz shot and killed Captain Chad Reed of the Dixie County Sheriffs Office. Prior to the trial in this case, Kalisz had been convicted and sentenced in Dixie County to life in prison for first-degree murder. During the guilt phase of the present case, neither the murder of Captain Reed nor Kalisz’s conviction for that murder was addressed; they were discussed only during the penalty phase of Kalisz’s trial.
On January 27, 2010, thirteen days after the murders, and shootout with police, Florida Department of Law Enforcement agents April Glover and Barbara McGraw, as well as Detective Bryan Faulkingham of the Hernando County Sheriffs Office, travelled to interview Kalisz at Shands Hospital. Kalisz was restrained to his bed. Michael Johnson, a licensed clinical social worker, spoke with Kalisz prior to the interview with law enforcement. Johnson testified that on January 27, Kal-isz agreed to speak with law enforcement.
When Detective Faulkingham arrived, he had two pocket recorders. Detective Faulkingham explained to Kalisz that there were “a couple of formalities ... to get out of the way” before the interview began. Detective Faulkingham inquired whether Kalisz knew his Miranda[2] rights, to which Kalisz responded, ‘Tes, sir ... you’ve seen my record.” Detective Faulk-ingham then asked Kalisz if he would ob *193 ject if the interview was recorded. Although Kalisz initially responded “yes,” it appears from the context of the interview that Kalisz meant that he was not opposed to recording the interview.[3] Detective Faulkingham advised Kalisz of his Miranda rights and asked again if he objected to the recording of the interview, to which Kalisz responded “[n]o, don’t think so.”
Detective Faulkingham asked Kalisz some basic questions, including whether he knew where he was and the date. Kalisz responded that he was in Hernando County, and that it was January 19, 2010. • He was in fact in Alachua County, and it was January 27, 2010. The interview continued, and Kalisz stated that “over a gradual period of time, I couldn’t take it anymore.” He said he “couldn’t take the charge. I couldn’t take the abuse from the bond and I couldn’t take any of it anymore.... ” Kalisz continued that “[a]ll this stuff that went on with Manessa, everything were total lies.” He explained that he had to “spend every last penny of my own mother’s inheritance to fight that, to get sentenced to six years over something I never did.” Detective Faulkingham and Agent McGraw asked Kalisz to further discuss the issues he had with Manessa, to which Kalisz responded that he was “a little hesitant” because he was “a guy who doesn’t have a lawyer sitting in front of him.” Detective Faulkingham responded, “[w]ell you’ve already been convicted of that, right? ... But I am saying you have already been to trial over that all with Manessa.”
It appears that the source of Kalisz’s anger stemmed from legal problems associated with Kathryn and Manessa. During the interview, Kalisz stated that he did not care to live in a world where someone allegedly could place suggestive material on his computer and not be punished. In 2009, Kalisz had pled to charges of contributing, to the delinquency of a minor and aggravated assault with a deadly weapon. Pursuant to the plea, Kalisz was sentenced to ten years of felony probation with sex offender conditions although he was not technically placed on sex offender probation. Part of this plea agreement was a “no contact” court order with Manessa. Because of circumstances related to his probation, Kalisz, who had been living the latter part of his life in Colorado for approximately nineteen years, was precluded from returning to Colorado and was required to remain in Florida.
Agent Glover and Detective Faulking-ham testified that during the interview, Kalisz responded appropriately to questions at times, but also spoke off subject at other times. Michael Johnson, the social worker at Shands, was present for the beginning of the interview, but recorded in progress notes that Kalisz “was orientated to self, that he was in [a] hospital, but didn’t know the correct city or the date.” The interview lasted approximately three hours and included one break that Kalisz requested. In addition to the statements already addressed, Kalisz admitted that he bought a gun to “foliage shit” and “erase the hell out that Kitty and her blood line.” He also said that his plan was to “[s]top the shit,” and he was going to accomplish his plan with however many bullets or guns that were required and with whatever guns he had available. He expressed frustration because he had “[spent] over eight grand on that girl and my mother’s somebody ... to sit there and watch the bitch throw me in jail for some punk that puts his head through a friggin wall.” Kalisz confirmed this statement was directed toward Manessa and her boy *194 friends. Kalisz also stated that killing Kathryn was his primary objective.[4]
The defense moved to suppress Kalisz’s confession. After the hearing on the motion, which included the presentation of numerous witnesses and audio and video recordings of the confession, the trial court denied the motion. On January 23, 2012, the jury rendered a verdict finding Kalisz guilty of two counts of first-degree murder, two counts of attempted first-degree murder, and one count of burglary of a dwelling.
During the penalty phase, Nicole Tillot-son DiConsiglio and Lauren Tillotson, daughters of the deceased Deborah, read victim impact statements and addressed the impact that the loss of their mother has had on their lives. The State introduced a certified judgment reflecting that Kalisz had been convicted and sentenced for the first-degree murder of Captain Chad Reed. A probation officer with the Florida Department of Corrections (DOC), testified that she supervised Kalisz in November of 2009 for an earlier conviction of aggravated assault with a deadly weapon, a conviction that was unrelated to the murders of Captain Reed and those at issue in the instant case.
The defense presented several of Kal-isz’s family members and friends. Linda Pleva, one of Kalisz’s five siblings, testified with regard to the time she and Kalisz spent during the early part of the 1980s drinking and partying together after Kal-isz separated from the Army. Pleva explained that all of her brothers were alcoholics. Eventually, Pleva discontinued contact with Kalisz because she realized that her behavior was affecting her children. Thereafter, Kalisz became homeless for approximately fifteen years. In 1990, Kalisz called Pleva and stated that he had started a new life in Colorado, that he was sober and also a dedicated member of AA, and that he was working as a roofer. Later that year, one of Kalisz’s brothers committed suicide. In 2004, Kalisz developed various health problems that affected his ability to work. In 2008, Kalisz’s mother died, and Kalisz was very upset. In 2009, while in Florida, Kalisz was placed on probation because of his legal problems with Kathryn and Manessa. Due to these problems, Kalisz was precluded from returning to Colorado. Then, a few days before the murders involved in this case, Kalisz’s mobile home, with his few remaining possessions, was destroyed in a fire. Pleva stated that around this time, it appeared that AA had shunned Kalisz. Pleva said that Kalisz called her twice on the day of the murders. During the second conversation, which occurred after the murders, Kalisz told her “it was over.”
Becky Berarducci, another of Kalisz’s sisters, testified that when the siblings were growing up, they were “not allowed to show emotion in their house,” and that all of the children started drinking as teens. In the 1990s, when Kalisz became sober, Berarducci visited Kalisz in Colorado. She stated that Kalisz was very proud of his life in Colorado, and that for the next fifteen years, his life was “all about AA.” Kalisz and Berarducci attend *195 ed AA meetings together in Colorado, and Kalisz helped Berarducci’s daughter become sober. After Kalisz’s home had been destroyed, Berarducci noticed that “something was really, really wrong.” According to Berarducci, Kalisz showed no emotion with regard to the incident and did not react when she and her other brother found some of Kalisz’s mementos from AA in the rubble.
Tammy Debaise was previously married to one of Kalisz’s brothers. After her divorce, Debaise moved to Colorado to be with Kalisz for approximately five years. Debaise described Kalisz as very generous and committed to helping those who were “down and out.” Debaise described attending AA meetings throughout the country with Kalisz. She testified that Kalisz’s life was really in Colorado, and she was aware that he was required to travel to Florida for court hearings. During his trip to Florida, his tools for his Colorado-based roofing business were stolen. Later, Kalisz’s home in Florida was destroyed, and he had four heart attacks.
Mark McQuery met Kalisz at an AA meeting in Colorado and attended meetings with Kalisz for approximately two years. McQuery explained that Kalisz was known to be a “Big Book thumper,” which means that Kalisz was a proponent of following the AA program exactly as written in the program’s manual, the Big Book. McQuery stated that Kalisz mentored many people in AA, particularly “the tougher customers,” such as homeless people. It had been more than ten years since McQuery had last seen Kalisz.
Peter Tippette, a real estate broker in Colorado and a member of AA, met Kalisz approximately fifteen years ago and testified during trial with regard to Kalisz’s active involvement in mentoring people in AA. Tippette described Kalisz as a friend who also performed excellent roofing work for a fair price.
Seth Paumen, a neighbor of Kalisz’s in Colorado, testified that Kalisz had a willingness to share his roofing knowledge with others and described him as a good boss to his employees. Paumen also stated that Kalisz was a good neighbor, and that Kalisz was known as someone who helps others in the community.
Todd Linville met Kalisz at an AA-meeting in Florida. Kalisz sponsored Linville for eight months, but Linville chose a new sponsor after being informed of Kalisz’s legal problems. Linville also stated that Kalisz’s participation in AA decreased during 2009. Linville saw Kalisz on January 13, 2010, the night before the murders, and described Kalisz as distraught, helpless, defeated, and in turmoil.
A videotaped deposition of Robert McMakin was presented to the jury. He met Kalisz during an AA meeting in Texas and served as Kalisz’s long-distance AA sponsor. He described Kalisz as very dogmatic, enthusiastic, and protective of AA. He stated that although Kalisz was tough, he was a good sponsor. McMakin described Kalisz as very generous. McMa-kin also testified that he spoke to Kalisz after he was arrested in connection with these events. Kalisz advised McMakin of the murder charges and expressed concern with regard to killing a police officer because he (Kalisz) knew that the officer had small children. Phyllis McMakin, Robert’s wife, stated in a videotaped deposition that she met Kalisz twenty years ago and described him as a helpful person. She testified that after his home was destroyed by fire, Kalisz was very distraught, depressed, and frustrated.
Melissa Williams, a friend and former neighbor of Kalisz, also described Kalisz as a good neighbor, a fair employer, and someone who would lend others money. *196 She stated that she respected Kalisz, and while in college, she had written an essay about him as someone who inspired her.
Ronald McAndrew, a former Florida prison warden, was accepted by the court as an expert on the DOC prison system, and testified that any warden would be pleased to see a person like Kalisz develop an AA program within the prison system. He stated that Kalisz would be a leader and an asset to the general DOC population. If Kalisz was on death row, however, he would not receive the same opportunity to develop a program and counsel others. McAndrew acknowledged that Kalisz was charged with having contraband in his jail cell on August 10, 2011.
Dr. Peter Bursten, a forensic psychologist, evaluated Kalisz in 2010. He reviewed all discovery information, police reports, and background information, and conducted telephone interviews with Kal-isz’s family, Todd Linville, and Kalisz’s ex-wife. Dr. Bursten testified that he spent approximately seven hours face-to-face with Kalisz. Although Kalisz was “straightforward” during their interviews, he was also “emotionally very constricted and non-expressive.” Dr. Bursten testified that Kalisz had a complicated relationship with his father, who was an alcoholic and physically abusive. His father’s conduct instilled feelings of rejection, dislike, and inadequacy in Kalisz during his adolescence. Dr. Bursten noted that Kalisz suffered from substance abuse by age twelve, and after separating from the military, Kalisz reverted to a life of homelessness and substance abuse.
Dr. Bursten testified that AA did not cure Kalisz’s problems, but it did help him cope with them. AA provided Kalisz with a sense of belonging and self-esteem for almost twenty years. However, Kalisz’s life began to unravel when his mother passed away in 2008 and he was convicted of a criminal offense in 2009. With the 2009 conviction, he lost the support of his family and negative feelings developed between him and his family. The conviction also prevented Kalisz from returning to Colorado, which was a “big part of his identity ... [that was] taken from him against his will.”
Dr. Bursten also described Kalisz as having antisocial personality traits. Dr. Bursten explained that Kalisz’s acute stress disorder did not develop “in isolation,” but seemed to be triggered by the explosion, and resulting destruction, of his home.[5] According to Dr. Bursten, Kalisz blamed his sister Kathryn for his problems. Dr. Bursten stated that although Kalisz had experienced a loss of control over his emotions and demonstrated inhibited judgment, he could still understand things. In Dr. Bursten’s opinion, Kalisz was not insane at the time of the murders, and he “absolutely” had the ability to understand the difference between right and wrong.
On January 26, 2012, by a unanimous verdict (12-0), the jury recommended that death sentences be imposed on Kalisz for the murders of both victims. On February 17, 2012, the trial court held a Spencer[6] hearing. The State presented additional victim impact statements to the court. The defense presented written statements from Tammy Debaise and Linda Pleva, both of whom had testified during the penalty phase. Kalisz declined to provide a statement.
On March 6, 2012, after independently weighing the aggravating and mitigating *197 circumstances, the trial court imposed two sentences of death, one for each of the murder victims. The court also imposed two sentences of life imprisonment, one for each of the surviving victims, and a sentence of life imprisonment for the burglary with a firearm charge. With regard to the death sentences, the trial court found six aggravating circumstances: (1) the capital felony was committed by a person previously convicted of a felony and under sentence of imprisonment or placed on community control or on felony probation (great weight); (2) Kalisz was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person (great weight);[7] (3) Kalisz knowingly created a great risk of death to many persons (great weight); (4) the capital felony was committed while Kalisz was engaged in the commission of a burglary (moderate weight); (5) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest (moderate weight); and (6) the capital felony was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification (CCP) (great weight).
The trial court found as a statutory mitigating circumstance that each capital felony was committed while Kalisz was under the influence of an extreme mental or emotional disturbance (little weight). The trial court also found the following non-statutory mitigating circumstances:- (1) Kalisz has a long, well-documented history of alcohol and drug abuse (some weight); (2) Kalisz successfully overcame his alcohol addiction (some weight); and (3) Kalisz helped others through Alcoholics Anonymous, maintained gainful employment, and performed kind and generous deeds for others (little weight). In imposing the two death sentences, the trial court held that the aggravating circumstances of each murder outweighed the mitigating circumstances.
On March 23, 2012, Kalisz filed a notice of appeal with this Court challenging only his death sentences.
ANALYSIS
Motion to Suppress the Confession
Kalisz first claims that he did not exercise a knowing and voluntary waiver of his Miranda rights when he was interviewed at Shands Hospital. Kalisz concedes that there is “overwhelming evidence” of his guilt, and therefore directs his claim toward only the penalty phase of his trial. He requests the vacation of his death sentences and a new penalty phase that excludes the hospital statements. He further contends that the admission of his confession was not harmless error because the State relied on the hospital statements to prove CCP, and the trial court emphasized these statements in the sentencing order.
This claim primarily turns upon the following excerpted portion of the interview with law enforcement, which occurred thirteen days after Kalisz committed the murders.
FAULKINGHAM: . Okay, John, I’m Bryan Faulkingham from Hernando. Drove up here to talk to you a little bit, maybe answer some questions you might have. Maybe you can answer some questions we have. You say you are not sure why you are here or do you know why you are here? Okay.
KALISZ: I’m knocked out and (incomprehensible).
*198 FAULKINGHAM: Do you know what happened to you or what caused your injuries or anything like that?
KALISZ: I am coming outta Hernando.
FAULKINGHAM: Uh-huh.
KALISZ: Oh, yeah.
FAULKINGHAM: What’s that?
UNIDENTIFIED VOICE: May have to speak up a little bit, John.
KALISZ: Ido.
UNIDENTIFIED VOICE: You remember what happened?
KALISZ: A little bit.
FAULKINGHAM: That’s kind of what we want to' talk to you about. See what you remember, and you may have some questions that we can answer for you. I understand you have been inquiring about some of your property and things along those lines. So we can probably answer those questions for you as well. Do you have anything that comes to mind right now that you wanted to ask us?
KALISZ: What am I being charged with first off? Secondly, is there (unintelligible) continuing with the (unintelligible). I’m going to (inaudible).
FAULKINGHAM: Okay. The first was what, what you are being charged with? Okay, what was the second question?
KALISZ: Is it even worth being charged or letting these charges go on?
FAULKINGHAM: Okay. I’m sorry, I still didn’t understand you on the second part of that, is it worth what?
KALISZ: Letting these charges go on.
FAULKINGHAM: Oh, okay, that’s — [I] could tell you what you are going to be charged with and all that kind of stuff. There are a couple of formalities we got to get out of the way before we get to that point, though, one of which I have got to tell you what your Miranda rights are, okay?
KALISZ: Okay.
FAULKINGHAM: Do you know what your Miranda rights are?
KALISZ: Yes, sir.
FAULKINGHAM: You do. I’m going to read them to you again, but then I’m going to—
KALISZ: Said in there, you’ve seen my record.
FAULKINGHAM: I’m going to read them to you again, then I will answer whatever questions you might have. Okay? John, do you have any objections to us recording the stuff that we talk about? The stuff that we tell you and the stuff you tell us?
KALISZ: Yeah.
[[Image here]]
KALISZ: Okay. You know (unintelligible) I come outta these things. I personally don’t think a hell of a lot has been going on legally to me here. I don’t believe that all the things I have been going through have been legal, through legal channels.
McGRAW: Okay.
KALISZ: So I’ve got a real hard time with, with talking. But then again, I don’t have a real hard time with anything. I mean, I’m on my way out.
McGRAW: All right. Well Detective Faulkingham is going to read you your constitutional rights, which you understand, you know, why we are doing that. So he is going to read it to you so you understand, okay? All right.
FAULKINGHAM: John, you have the right to remain silent. Anything you say, can and will be used against you in a court of law. You have the right to talk — you have the right to talk to a lawyer and have one present with you while you are being questioned. If you cannot afford to hire a lawyer, one will *199 be appointed to represent you before any questioning if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements. Do you understand what I read to you? Do you have any questions about that? Did you understand each of those things that I said? Okay. And you said you have had those read to you before, and I read them off a form here, okay, a million times already. And you understand. And getting back, you care if we record this conversation with you? Do you have any objections to that?
KALISZ: No, don’t think so.
McGRAW: Okay.
FAULKINGHAM: Do you mind if we video record it? You have any objections to that?
KALISZ: No.
[[Image here]]
FAULKINGHAM: Hey, John, let me start with some simple questions as far as, do you know where you are at right now? I mean, other than a hospital? You know what hospital you’re in or anything like that.
KALISZ: Yeah, I think I’m in Hernan-do County.
FAULKINGHAM: You think you are in Hernando County. Okay. Do you know what the date is? I mean, anything like the day or anything?
KALISZ: The 19th.
FAULKINGHAM: The 19th of what? Do you know what month? Do you know what year?
KALISZ: January.
FAULKINGHAM: January 19. You know what year?
KALISZ: 2010.
FAULKINGHAM: The date is actually January 27. It is Wednesday, and it is about 5:42 in the evening, okay. You are at Shands Hospital in Gainesville. All right. It is about an hour and-a-half north of Hernando County.
KALISZ: Is that it?
FAULKINGHAM: Do you know how you came to be in a hospital?
KALISZ: Um, no.
FAULKINGHAM: Do you know how you got hurt?
KALISZ: Um, I think I do know how.
FAULKINGHAM: What do you think happened to you?
KALISZ: (unintelligible) These people got me screwed up on drugs or something.
FAULKINGHAM: Okay.
McGRAW: John, what is the last thing you remember before you came in the hospital?
KALISZ: Before I came in this hospital? I think I’ve been in and out of this hospital a couple of times.
McGRAW: Yeah. What is the last thing you remember being outside of the hospital?
KALISZ: Um, not at the hospital. It was drug rehab. Somebody came in and wanted to (unintelligible) drugs, smoking, cigarettes, cigarette smoking deal. I don’t know how well you can take my in (unintelligible) you know I’m still piecing it together. I am still wishing I did more. Still wishing I did less. Still wishing I had more to do more, and so wishing I had less to do. Does that— you understand?
McGRAW: I understand that.
Kalisz did not execute a written waiver of his Miranda rights. Based on the transcript and the audio recording,[8] it does not *200 appear that Kalisz said anything responsive with regard to his right to remain silent after Detective Faulkingham read him his Miranda rights. That is, he did not expressly state he was waiving his rights or declining to waive them. Kalisz did, however, proceed to talk to law enforcement for approximately the next three hours.
The excerpt reveals that before Detective Faulkingham read Kalisz his Miranda rights, he asked Kalisz if he knew what they were, to which Kalisz responded “yes sir” and “you’ve seen my record.” During the hearing on the motion to suppress, Detective Faulkingham testified that Kal-isz also said he had been read his rights “a million times,” while the transcript and audio recording attribute the “a million times” comment to Detective Faulking-ham. Detective Faulkingham explained that he had spoken over Kalisz, which is why the transcript and audio recording do not reflect that Kalisz had also spoken these words. During the suppression hearing, Agent Glover testified that she too heard Kalisz say that he had heard his Miranda rights “a million times.”
Johnson, the Shands social worker, was present when Detective Faulkingham read Kalisz his Miranda rights. Johnson testified that he could not remember if Kalisz acknowledged that he heard Detective Faulkingham read the Miranda warnings, but he did remember that Kalisz agreed to speak with law enforcement.
Detective Faulkingham testified that Kalisz did not fall asleep during the interview, but at times his eyes were closed. He also said that although Kalisz responded inappropriately to some questions, overall Kalisz’s responses were appropriate. During an earlier portion of the interview, but after Detective Faulkingham read Kal-isz the Miranda rights, the following discussion transpired:
FAULKINGHAM: You said that people screw you over?
KALISZ: (unintelligible).
FAULKINGHAM: Like who?
KALISZ: You.
FAULKINGHAM: Who else?
KALISZ: You.
FAULKINGHAM: Friends? Family?
KALISZ: Friends, family. It doesn’t matter.
FAULKINGHAM: Everybody?
KALISZ: See what I’m saying, it doesn’t matter. All this stuff that went on with Manessa, everything were total lies.
FAULKINGHAM: Uh-huh.
KALISZ: But I had to spend every last penny of my own mother’s inheritance to fight that, to get sentenced to six years over something I never did.[9]
FAULKINGHAM: Right. Right. Why would she do something like that?
KALISZ: Because she’s a pig.
McGRAW: What happened with Manes-sa’s? I’m not aware of it.
*201 KALISZ: I don’t know. We can talk about it all day. It’s probably easier to look through the police reports.
McGRAW: I want to hear from you, John.
KALISZ: Oh, well you know, talking to a guy who doesn’t have a lawyer sitting in front of him. I’m a little hesitant to begin with.
FAULKINGHAM: Well you’ve already been convicted of that, right?
KALISZ: That’s — (unintelligible)
FAULKINGHAM: But I am saying you have already been to trial over that all with Manessa.
KALISZ: Oh, yeah.
During the interview, Kalisz discussed a variety of topics concerning his life and his family. He explained that he lived in a mobile home and that he had been sober for nineteen years. He stated that Kathryn, his sister, had taken his roofing career away from him. He explained that he needed guns for an “operation that [he] was going to put families through,” which involved a plan to “foliage shit.” This plan involving “stop[ping] this shit” with bullets and whatever guns he had. Later, Kalisz stated that he understood his life was over, and was upset that Kathryn was not “going to get her dues.” When Detective Faulkingham asked why Kalisz believed Kathryn w;ould not “get her dues,” Kalisz responded by suggesting that Kathryn had survived and was not dead after he “started shooting everybody” at the residence.
Detective Faulkingham asked Kalisz who was present at the house when he started shooting, to which Kalisz responded: “Kitty and Manessa.... I think Suzy was there.... Some people running on a railroad track.... Somebody running around acting like an idiot.” Kalisz followed with the statement that he shot' everyone at the residence until he expended all of his ammunition and “they shut up.” Afterward, Kalisz said he called his sister, Linda Pleva, and told her “it was over ... the shit is over_” Kalisz recounted other events from that day with law enforcement for the remainder of the interview.
Standard of Review
Appellate courts accord a presumption of correctness to the trial court’s ruling on a motion to suppress with regard to the determination of historical facts, but must independently review mixed questions of law and fact that determine constitutional issues arising in the context of the Fifth Amendment and article I, section 9, of the Florida Constitution. Delhall v. State, 95 So.3d 134, 150 (Fla.2012); Miller v. State, 42 So.3d 204, 220 (Fla.2010). This Court accepts the factual findings of a trial court as long as those findings are supported by competent, substantial evidence. Hall v. State, 107 So.3d 262, 271-72 (Fla. 2012), cert. denied, — U.S. -, 134 S.Ct. 203, 187 L.Ed.2d 137, 2013 WL 3212132 (2013); Thomas v. State, 894 So.2d 126, 136 (Fla.2004). Additionally, the State bears the burden to establish, by a preponderance of the evidence, that a confession was freely and voluntarily given. Miller, 42 So.3d at 220.
The Fifth Amendment to the United States Constitution provides that “[n]o person ... shall be compelled in any criminal case to be a witness against himself.” To aid in the preservation of this right, in Miranda the United States Supreme Court articulated the following rule:
[I]f a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent. For those unaware of the privilege, the warning is needed simply to make them aware of it — the threshold requirement *202 for an intelligent decision as to its exercise.
Miranda, 384 U.S. at 467-68, 86 S.Ct. 1602. The right to remain silent is one of four procedural warnings that must be provided before questioning commences with regard to a suspect who is in custody to protect his or her privilege against self-incrimination. Id. at 479, 86 S.Ct. 1602. These four warnings are: (1) the suspect has the right to remain silent, (2) anything the suspect says can be used against him in a court of law, (3) the suspect has the right to the presence of an attorney, and (4) if the suspect cannot afford an attorney, one will be appointed prior to any questioning if the suspect desires. Id. A defendant may waive these rights, provided the waiver is voluntary, knowing, and intelligent. Id. at 444, 86 S.Ct. 1602. Florida courts rely on the “totality of the circumstances” approach to assess the validity of a waiver. Ramirez v. State, 739 So.2d 568, 591-92 (Fla.1999).
Analysis
In Berghuis v. Thompkins, 560 U.S. 370, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010), the United States Supreme Court confronted a factual situation and legal issue similar to that presented here. In Thompkins, law enforcement read the defendant his Miranda rights before they began to interrogate him. Id. at 2256. Law enforcement requested that the defendant sign the form from which the Miranda rights had been read, but the defendant declined. Id. The Supreme Court noted that the “record contain[ed] conflicting evidence about whether Thompkins then verbally confirmed that he understood the rights listed on the form.” Id. Thereafter, officers began the interrogation, during which the defendant largely remained silent, except for “a few limited verbal responses.” Id. The interrogation lasted approximately three hours. Id. The defendant subsequently challenged the refusal of the trial court to suppress his pretrial statements as an alleged violation of Miranda. Id. at 2258. On certiorari review, the Supreme Court addressed whether a defendant invokes the right to remain silent by not saying anything for a sufficient period of time. Id. at 2259.
To resolve this question, the Supreme Court first analogized an ambiguous invocation of the right to remain silent to an equivocal invocation of the right to counsel. Id. at 2260. The Court then characterized the decision of the defendant not to speak for a period of time as analogous to an ambiguous invocation of the right to remain silent. Id. The Supreme Court ultimately concluded that the defendant’s claim that he had not waived his Miranda rights was “unpersuasive.” Id. at 2259. The Court held that when an accused “makes a statement concerning the right to counsel ‘that is ambiguous or equivocal’ or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her Miranda rights.” Id. at 2259-60 (quoting Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)) (internal citations omitted). Finding “no principled reason to adopt different standards for determining when an accused has invoked the Miranda right to remain silent and the Miranda right to counsel,” the Supreme Court denied the defendant relief on the basis that he did not respond to law enforcement after they read him his Miranda rights. See id. at 2260 (“Thomp-kins did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his ‘right to cut off questioning.’ ... [H]e did neither, so he did not *203 invoke his right to remain silent.” (internal citations omitted)).
The Supreme ' Court then addressed whether the State had met its heavy burden of demonstrating that the defendant had knowingly and intelligently waived his privilege against self-incrimination. Id. at 2261. The Supreme Court acknowledged that “[s]ome language in Miranda could be read to indicate that waivers are difficult to establish absent an explicit written waiver or a formal, express oral statement.” Id. at 2260-61. However, the Supreme Court also concluded that the course of decisions since Miranda demonstrated that waivers can be established “absent formal or express statements of waiver.” Id. at 2261. The Court reiterated that the main purpose of Miranda is to ensure that the accused is advised of and understands his rights. Id. Thus, the Court concluded that the prosecution does “not need to show that a waiver of Miranda rights was express. An ‘implicit waiver’ of the ‘right to remain silent’ is sufficient to admit a suspect’s statement into evidence.” Id. (quoting North Carolina v. Butler, 441 U.S. 369, 373, 376, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)). The Court also noted that the defendant’s “sporadic answers to questions throughout the interrogation” confirmed that the defendant had waived his right to remain silent. Id. at 2263. .
A determination of whether a defendant has waived his or her right to remain silent is based on the totality of the circumstances. See Ramirez, 739 So.2d at 591-92. Here, Kalisz was admitted to Shands Hospital following his arrest in Dixie County on January 14, 2010. He had been wounded at a gas station after exchanging gunfire with law enforcement. On January 27, 2010, thirteen days after the incident, a clinical social worker informed Kalisz, who was still at Shands, that law enforcement wanted to interview him. Kalisz agreed to speak with law enforcement, and agents Glover and McGraw and Detective Faulkingham interviewed Kalisz that same day.
Kalisz subsequently moved to suppress his January 27, 2010 statements to law enforcement. During the hearing on the motion, the State presented Bruce Gold-berger, a forensic toxicologist. Dr. Gold-berger reviewed Kalisz’s medication records related to the time he spent at Shands, and explained that Kalisz was on Roxicet, a controlled substance. Although he conceded that Kalisz could not operate a motor vehicle and, at times, responded inappropriately to specific questions, Dr. Goldberger concluded that Kalisz’s faculties were “not impaired to the extent that he could not give consent or factual information regarding the event [on January 14, 2010].” In Dr. Goldberger’s opinion, Kalisz’s mannerisms during the interrogation were not typical of someone impaired by drugs. Rather, his speech and behavior, which involved closing his eyes, were due to a recent surgery and was similar to his behavior in court.
Daniel Buffington, a clinical pharmacologist, testified on behalf of the defense. He reviewed Kalisz’s medical records, the transcript of Kalisz’s interview, and the corresponding video recording. Buffing-ton did not review the audio recording, which contained the portion of the interview during which Detective Faulkingham advised Kalisz of his Miranda rights. Buffington testified that Kalisz was on a variety of medications on the day of the interview. These medications would have impacted Kalisz’s “cognitive status” to varying degrees and would have taken approximately one day to clear his system. He stated that Kalisz’s behavior was not a product of toxication, such that his clinical status would degrade in accordance with *204 blood concentration, but was a product of the adverse side effects of various medications. Kalisz had received his medications at least nine hours prior to the interview. Buffington offered the opinion that Kalisz’s behavior on the video was consistent with the side effects of receiving these medications.
The trial court found that the State had proven by a preponderance of the evidence that Kalisz knowingly, voluntarily, and intelligently provided his statements to law enforcement. The trial court noted that although there were times when Kalisz did not respond clearly, or provided an evasive or incorrect answer, given the totality of the circumstances, there was “no coercion on the part of the investigating officers.” Kalisz also indicated to the officers that he was familiar with the Miranda warnings because he had been arrested before and received them previously, and that he understood his rights. The court also found that his behavior, which involved “continued responses to questions,” indicated that Kalisz’s statement was knowing and voluntary. Despite the medications Kalisz received, the court noted that when Kalisz spoke during the interview about specific events concerning the crimes, he “was more animated ... more attentive,” and that “his eyes were clear, and he was responding appropriately within the context of what was being asked.” The trial court also found that the failure of Kalisz to receive a first appearance prior to the interview did not preclude his statements from being admitted into evidence.
As previously discussed, this Court accords a presumption of correctness to a trial court ruling on a motion to suppress and accepts its factual findings insofar as those findings are supported by competent, substantial evidence. See Delhall, 95 So.3d at 150; Miller, 42 So.3d at 220; Medina v. State, 466 So.2d 1046, 1049 (Fla. 1985). In rendering the decision to admit Kalisz’s confession, the trial court reviewed the video and audio recordings of the interview at the hospital, and evaluated the credibility of the State and defense experts .with regard to whether Kalisz was capable of providing a knowing, voluntary, and intelligent consent when he waived his Miranda rights. In denying the motion to suppress, the trial court noted
there was an indication that he understood what his Miranda [r]ights were. He did not respond — not where you could hear it on the tape to a direct question about Miranda. He didn’t give a yes or no answer that I heard on the tape. But by his reference and by his action, and by his continued responses to questions, I think he indicated, or it was clear that he was making a knowing and voluntary statement.
In Ramirez, this Court outlined various factors as relevant to a totality-of-the-circumstances assessment of whether a defendant voluntarily waived his or her Miranda rights. Of those factors, the following are relevant to this case: (1) the manner in which the Miranda rights were administered, including any cajoling or trickery; (2) the suspect’s age, experience, background and intelligence; (3) whether the interrogators secured a written waiver of the Miranda rights before questioning began; and (4) the location of the interview. Ramirez, 739 So.2d at 575-76. Here, there is no dispute that law enforcement informed Kalisz of his Miranda rights. This occurred without any “cajoling or trickery” and at the beginning of the interview. Id. at 576. Second, Kalisz is an adult and, as evidenced by his comments concerning his extensive criminal record, had experience with the criminal justice system. Third, there is no dispute that law enforcement did not secure a written waiver of Kalisz’s Miranda rights *205 before he was questioned. The fourth factor — the location of questioning — is the most nuanced.
The interview occurred in Kalisz’s room in Shands Hospital. He was hospitalized for injuries he had sustained when he exchanged gunfire with law enforcement on January 14, 2010. Kalisz was restrained to his bed during the interview and guarded by two deputies. Although the defense expert witness, Buffington, did not explicitly state that he believed Kalisz could not exercise informed consent to waive his rights given the variety of medications he was receiving, he did state that based on his review of the videotape, it appeared the medications “impact[ed] him clinically.”
In Escobar v. State, the defendant was hospitalized following a shoot-out with law enforcement officers. 699 So.2d 988, 991 (Fla.1997), abrogated on other grounds by Connor v. State, 808 So.2d 598 (Fla.2001). While hospitalized, the defendant confessed to the crime. Id. at 993. During a hearing on the motion to suppress the confession, a treating physician and non-treating psychiatrist testified on behalf of the defense that, given the defendant’s dosage of morphine, he could not have knowingly, intelligently, and voluntarily waived his Miranda rights. Id. The State, in response, presented hospital records and the testimony of a treating nurse who stated that the defendant’s vital signs were stable, he was alert and active, and he had a high tolerance for morphine. Id. The trial court found that the nurse was a more credible witness than the witnesses presented by the defense, and consequently found that the defendant had knowingly, intelligently, and voluntarily waived his Miranda rights. Id.
On appeal, the defendant contended that the trial court erred when it denied his motion to suppress and admitted his statement into evidence because his medical condition, which required the administration of morphine, prevented him from providing a knowing and voluntary waiver of his Miranda rights. Id. at 993-94. This Court affirmed the trial court and held that competent, substantial evidence supported the conclusion that the confession had been voluntary despite the medical condition of the defendant. Id. at 994. This Court explained that simply because the evidence presented was conflicting did not mean the State had failed to meet its burden to demonstrate by a preponderance of the evidence that the confession was voluntarily provided and the defendant knowingly waived his rights. Id. (citing Thompson v. State, 548 So.2d 198, 204 (Fla.1989)). This Court added that “[w]hen evidence adequately supports two conflicting theories, our duty is to review the record in the light most favorable to the prevailing theory.” Id. (citing Johnson v. State, 660 So.2d 637, 642 (Fla.1995)).
In keeping with Ramirez and Es-cobar, we affirm the determination of the trial court that Kalisz’s confession was freely and voluntarily provided, and that he knowingly and intelligently waived his rights under Miranda. The trial court viewed the video and weighed the medical testimony presented during the motion to suppress hearing and found the State expert to be more compelling. The trial court also reviewed the recordings of the confession, and the recordings did not persuade the court that Kalisz was incapable of rendering an informed decision as to whether to waive his Miranda rights. The audio recording reveals that Kalisz first acknowledged he was familiar with the Miranda rights based on prior experiences with the criminal justice system. Kalisz then heard Detective Faulkingham read those rights before he began to speak with law enforcement and implicate himself in the murders. At no point during the interview did Kalisz *206 indicate he no longer wished to speak with law enforcement and had decided to invoke his right to remain silent. Based upon our review of the record, we conclude that the decision of the trial court was based on competent, substantial evidence. Accordingly, we affirm the denial of the motion to suppress.
Moreover, even if the trial court had erred, admission of the confession here was harmless. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). Even Kalisz concedes that the admission of the confession was harmless error with regard to his convictions. Instead, his claim of harmless error is directed only at the finding of CCP for both murders, which he alleges would not have been found by the trial court without his hospital confession. However, because the court’s finding of CCP is supported by independent evidence, we conclude that this assertion is without merit.
The record reflects that Kalisz purchased hollow-point bullets and magazines for his Beretta handgun the day before the murders. His gun was modified by the addition of a laser sight, which enhances accuracy in firing the weapon. The record suggests that at some point, Kalisz informed his friend he was going to “take out” his sister. The day of the murders, Kalisz engaged in target practice. After Kalisz shot the women at Kathryn’s home, he called his sister and his friend and told them that he had “taken care of the problem.” Thus, the record supports the finding of this weighty aggravator irrespective of Kalisz’s confession.
Great Risk of Death Aggravating Circumstances
This Court will affirm the finding of an aggravating circumstance if the finding of the trial court is supported by competent, substantial evidence. See Silvia v. State, 60 So.3d 959, 971 (Fla.2011); McGirth v. State, 48 So.3d 777, 792 (Fla. 2010); Willacy v. State, 696 So.2d 693, 696 (Fla.1997). In Johnson v. State, this Court addressed whether the trial court properly found in aggravation that the defendant “caused a great risk of death to many persons.” Johnson, 696 So.2d 317, 324 (Fla.1997) (emphasis supplied). The trial court found this aggravating circumstance because the “murderous acts” of the defendant had placed the lives of four people other than the victim in peril. Id. at 325. On appeal, this Court affirmed the finding of this aggravating circumstance and explained the situation in which the aggravator is appropriately found: “[T]his aggravator cannot be supported in situations where death to many people is merely a possibility. Instead, there must be a likelihood or high probability of death to many people.... [T]he word ‘many’ must be read plainly.” Id. This Court then defined “many” as “four or more persons other than the victim [who] are threatened with a great risk of death.” Id. (emphasis supplied); see also Silvia, 60 So.3d at 971 (quoting Johnson); Lucas v. State, 490 So.2d 943, 946 (Fla.1986) (disapproving the great risk of death to many people aggravating circumstance because the “raging gun battle” did not meet the victim-plus-four-other-people threshold).
Here, the trial court found that despite Johnson’s four-person threshold, Kalisz engaged in “indiscriminate shooting” in the direction of at least four people who were “in the line of fire” and were placed in “an immediate and present risk of death.” The trial court noted that twelve nine-millimeter casings were recovered from inside and outside the residence, and that the shooting occurred in a residential area.
The evidence reveals that when Kalisz began shooting in Kathryn’s home, four women — Kathryn, Deborah, Manessa, and Amy — were present. Based on Kalisz’s *207 confession and witness testimony during trial, Kalisz arrived at the home to kill his sister, his niece, and anyone else who might stand in his way. Kalisz, therefore, could only have created a great risk of death to, at most, two other people besides Kathryn and Deborah, the two women he successfully murdered. Clearly, this does not satisfy Johnson’s numerical requirement for this aggravating circumstance to apply. See id. at 325. Although the State asserts that Kalisz created a great risk of death to at least four people besides the intended victims because, in addition to the women at Kathryn’s residence, a five-year-old child was playing nearby, this evidence was purely circumstantial and did not demonstrate that the child was at a greater risk than any other neighbor in the area. To include the child in this calculation would contradict our pronouncement in Johnson that this aggravator “cannot be supported in situations where death to many people is merely a possibility.” Id. at 325.[10]
For example, in Williams v. State, we reversed the finding of this aggravating circumstance where several people were present at a bank when the defendant committed an armed robbery and killed a bank guard. 574 So.2d 136, 138 (Fla.1991). We held that without more information to support the trial court’s finding, the factual situation alone did not support this aggra-vator. Id. Although we agreed that the defendant’s actions “created some degree of risk,” we could not conclude beyond a reasonable doubt that the defendant created an immediate and present risk of harm to the other people in the bank. Id. In contrast, we affirmed the great-risk-of-death aggravating circumstance where a defendant had set fire to a victim’s bed and, in doing so, endangered the lives of people asleep in the same building as the intended victim. See Welty v. State, 402 So.2d 1159, 1164 (Fla.1981); see also King v. State, 390 So.2d 315, 320 (Fla.1980), receded from on other grounds by Strickland v. State, 437 So.2d 150 (Fla.1983) (holding that the great risk of death aggravating circumstance was applicable where defendant set fire to a house in which the victim resided and no other person was present, but the defendant knew that the blaze would pose a great risk to neighbors, firefighters, and the police who responded). We have also affirmed this aggravating circumstance where an assailant engaged in indiscriminate shooting in the direction of at least four persons other than the intended victim at the victim’s residence. See Silvia, 60 So.3d at 972. These cases, however, are not analogous to what transpired here.
Evidence presented at trial reflected that Kalisz expressed a desiré to kill at least two of the four victims at the residence. Ultimately, Kalisz killed two of the four women present. Although it is reasonable to infer that had more people been present at the home, Kalisz’s indiscriminate murderous episode would have created a great risk of harm meeting (if not exceeding) the Johnson threshold, he did not confront those circumstances. Thus, the trial court’s finding that Johnson’s victim-plus-four-other-people threshold was met is incorrect. See Johnson, 696 So.2d at 325; Silvia, 60 So.3d at 972. We reiterate our prior rule in Johnson that this *208 factor is properly found only when, beyond any reasonable doubt, the actions of the defendant create an immediate and present risk of death to “many” persons. Because competent, substantial evidence does not support the finding of this aggravating circumstance, we conclude that the trial court erred in its ruling.
This error, however, does not merit a new penalty phase because it was harmless, and there is no reasonable possibility that it affected Kalisz’s sentences. See DiGuilio, 491 So.2d at 1135. There was significant other evidence presented during trial that supports Kalisz’s sentences. He was on felony probation for aggravated assault with a deadly weapon at the time of the murders. The contemporaneous murders of Kathryn and Deborah serve as prior capital felonies for each death sentence in addition to the murder of Captain Reed. The attempted murders of Manessa and Amy also serve as an additional aggravating circumstance. The trial court found that the evidence presented supported a finding of CCP, and we agree that CCP aggravator was properly found. Finally, Kalisz committed the murders during the course of a burglary. These aggravating factors and the weight given to them outweigh the mitigation found by the trial court. Therefore, any error in the trial court’s finding of this aggravating factor is harmless beyond a reasonable doubt.
Witness Elimination Aggravating Circumstance
The trial court also found that Kalisz committed the murders for the purpose of avoiding or preventing lawful arrest. The order does not indicate specifically if the court found this aggravator with regard to both Kathryn and Deborah or only one of the victims. Nevertheless, because we do not agree that the record provides competent, substantial evidence to support the finding with regard to either victim, we hold the trial court erred on this issue, but do not order a new penalty phase because the error was harmless.
The sentencing order detailed the following facts to support the finding of this aggravator:
(1) Kalisz had been sentenced, and was currently on, felony probation with sex offender conditions for contributing to the delinquency of a minor and aggravated assault with a deadly weapon. Part of his plea agreement was a court ordered “no contact” with the victim of the contributing to the delinquency of a minor conviction. The victim in that case was Manessa, a surviving victim in this case. Kalisz violated this “no contact” order by going to the location of the residence and employer of Manessa.
(2) Manessa is the niece of Kalisz and daughter of Kathryn. Kathryn is Kal-isz’s sister. Both of these women could identify Kalisz. The murder of Deborah occurred after she witnessed the murder of Kathryn. Testimony established that Deborah was only a few feet away from Kathryn when she was murdered, thus Deborah clearly saw the murder occur and, had she survived, could have identified Kalisz.
(3) Amy testified that she witnessed Kalisz shoot Manessa. Amy’s 911 call was played at trial. On that call she physically described Kalisz even though she had no idea who he was or what his relationship was to the other victims. At trial Amy identified Kalisz as the shooter.
(4) Amy and Manessa testified that they “played dead” in an attempt to survive after being shot multiple times.
Here, not only could the two murder victims identify Kalisz (at least one by *209 name and the other by physical description), but none of the victims posed a threat to Kalisz nor did any evidence suggest that they could have posed a threat. They were all unarmed and caught off guard and surprised by the sudden appearance of the gun-wielding assailant. Kalisz did not say anything upon entering the residence but merely entered and began shooting. Amy testified that she not only did not know who the assailant was, but she also had no idea why he shot any of the victims.
This aggravating factor has been proven beyond all reasonable doubt. However, given the totality of the circumstances, this aggravating circumstance is given moderate weight.
In finding the aggravating circumstance, the court relied on Preston v. State, 607 So.2d 404 (Fla.1992), in which we stated
We have long held that in order to establish this aggravating factor where the victim is not a law enforcement officer, the State must show that the sole or dominant motive for the murder was the elimination of the witness. However, this factor may be proved by circumstantial evidence from which the motive for the murder may be inferred, without direct evidence of the offender’s thought processes.
Id. at 409 (internal citations omitted). We have also explained that “proof of the intent to avoid arrest or detection must be very strong,” and “[m]ere speculation on the part of the state that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator.” Hernandez v. State, 4 So.3d 642, 667 (Fla.2009). Furthermore, the fact that a defendant may have had other motives does not preclude the application of this aggravating circumstance. Howell v. State, 707 So.2d 674, 682 (Fla.1998) (citing Fotopoulos v. State, 608 So.2d 784, 792 (Fla.1992)).
When evaluating whether the trial court properly found this aggravating circumstance, this Court
has found it significant that the victims knew and could identify their killer ... [and] looked at any further evidence presented, such as whether the defendant used gloves, wore a mask, or made any incriminating statements about witness elimination; whether the victims offered resistance; and whether the victims were confined or were in a position to pose a threat to the defendant.
Farina v. State, 801 So.2d 44, 54 (Fla.2001) (internal citations omitted); see also McGirth, 48 So.3d at 792-93. As identified by the trial court, some of the victims here knew and could identify Kalisz. Kal-isz did not wear gloves, a mask, or any other covering to obscure his appearance. The victims did not resist and were not in a position to pose a threat to Kalisz. The record indicates that Kalisz did not say anything when he shot each of the four women. These facts, however, still do not support the trial court finding that eliminating witnesses or avoiding arrest was Kalisz’s sole or dominant motive. See Preston, 607 So.2d at 409; Schoenwetter v. State, 931 So.2d 857, 873-74 (Fla.2006).
Rather, the record reflects that the dominant motive for the murder of Kathryn was revenge. While hospitalized, Kalisz told law enforcement that he intended to “erase the hell out that Kitty and her blood line” and to “foliage shit.” His other statements, both at the hospital and immediately following the murders to his sister, Linda Pleva, and his friend, reflect that he believed Kathryn and Manessa were responsible for his legal and financial problems. These facts demonstrate that Kalisz had a personal vendetta against Kathryn and her daughter, Manessa, and his ac *210 tions were motivated by reasons other than witness elimination or to avoid arrest. These feelings provided the impetus for his shooting spree.
Although part of the reason Kalisz murdered Deborah may have been to eliminate her as a witness to his crimes, the record equally supports the inference that Kalisz murdered her simply because she was in the wrong place at the wrong time. Therefore, we conclude that competent, substantial evidence does not support the trial court’s conclusion that witness elimination was Kalisz’s sole or dominant motive as required by Preston. See Preston, 607 So.2d at 409. Accordingly, we disapprove of the trial court’s finding of this aggravating circumstance as to both victims.
We do not, however, grant Kalisz a new penalty phase because the trial court’s finding of this aggravating circumstance was harmless. Four other aggravating circumstances remain in support of his sentences: Kalisz was on felony probation for aggravated assault with a deadly weapon; he committed prior capital and violent felonies; he committed the murders during the course of a burglary; and CCP. Therefore, any error in the finding of this aggravating circumstance is harmless beyond a reasonable doubt when weighed against the limited mitigation found by the trial court.
Admission of Autopsy Photographs
Kalisz next alleges that two autopsy photographs were improperly admitted during trial. These photos depicted gunshot wounds to Kathryn’s and Deborah’s bodies. During trial, Kalisz objected to the admission of these photos on the basis that they would inflame the jury and were redundant or repetitive. The trial court overruled the objection on the grounds that the photos proved the identities of the victims and would assist the medical examiner in his description of the victims’ wounds to the jury.
A trial court’s ruling on the admissibility of evidence will not be disturbed absent an abuse of discretion. Ruiz v. State, 743 So.2d 1, 8 (Fla.1999); Kearse v. State, 662 So.2d 677, 684 (Fla.1995) (citing Blanco v. State, 452 So.2d 520 (Fla.1984)). Florida law permits the ad mission of autopsy photos when they are relevant. See § 90.402, Fla. Stat. (2008); Larkins v. State, 655 So.2d 95, 98 (Fla.1995) (citing Wyatt v. State, 641 So.2d 355 (Fla.1994); Thompson v. State, 565 So.2d 1311 (Fla.1990)). This Court has upheld the admission of autopsy photographs to illustrate the testimony of a medical examiner concerning the nature and location of wounds and the manner of death. Larkins, 655 So.2d at 98 (citing Jackson v. State, 545 So.2d 260 (Fla.1989)). Furthermore, the admission of “particularly gruesome photographs” can be relevant and proper so long as the trial court exercises caution in admitting them and limits their numbers. Id.
Here, the contested autopsy photographs were not bloody or gruesome. Rather, these photos depicted small, cleaned bullet wounds, referred to as “entrance wounds,” that were located on Kathryn’s and Deborah’s bodies. Given that the photographs were clinical in nature and directly relevant to the testimony of the medical examiner with regard to the victims’ injuries, we affirm the decision of the trial court to admit these photographs. Cf. Ruiz, 743 So.2d at 8 (holding that the trial court improperly admitted a two-by-three foot photograph of the murder victims that “revealed in detail the bloody and disfigured head and upper torso”).
Admission of Victim Impact Statements
In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 *211 (1991), the United States Supreme Court held that the State may seek to introduce victim impact evidence if it concludes that such evidence “about the victim and about the impact of the murder on the victim’s family is relevant to the jury’s decision as to whether or not the death penalty should be imposed.” Id. at 827, 111 S.Ct. 2597. The admission of victim impact evidence is protected by article I, section 16, of the Florida Constitution, and is also specifically governed by section 921.141(7), Florida Statutes (2009), which states:
Once the prosecution has provided evidence of the existence of one or more aggravating circumstances as described in subsection (5), the prosecution may introduce, and subsequently argue, victim impact evidence to the jury. Such evidence shall be designed to demonstrate the victim’s uniqueness as an individual human being and the resultant loss to the community’s members by the victim’s death. Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as part of victim impact evidence.
A trial court’s decision to admit victim impact testimony is reviewed for an abuse of discretion. Braddy v. State, 111 So.3d 810, 857 (Fla.2012); Deparvine v. State, 995 So.2d 351, 378 (Fla.2008).
During the penalty phase, Nicole and Lauren, the daughters of victim Deborah, read prepared statements discussing the effect their mother’s death had, and continues to have, on their lives and family. Nicole discussed how she had engaged in scrapbook activities with her mother, but that she was unable to enjoy the activity since her mother’s death. Nicole described that she received a birthday card and gift in the mail from her mother the day after she died because her mother was killed the day before her birthday. Nicole also discussed that Deborah had arrived late to their last meeting together because her mother had found an injured dog in the road and had stopped to rescue it, notify the owner, and then deliver the dog to the owner. Lauren addressed that Deborah would never be a grandmother or be able to hold her grandchildren.
The statements were not overly emotional and did not mention Kalisz. The daughters did not implore the jury to impose the death penalty or to seek revenge on Kalisz for their mother’s death. Consequently, because the statements complied with the guidelines articulated in Payne and under Florida law, we affirm the trial court’s decision to allow introduction of the victim impact statements.
Cumulative Error
Kalisz claims that the trial court was “overzealous” when it instructed the jury, and this resulted in a “piling on” of two to three aggravating factors that did not apply. Thus, according to Kalisz, when the jury recommended the death penalty, its recommendation was tainted by instruction on inapplicable aggravating circumstances. In other words, Kalisz essentially claims that he is entitled to relief based on the cumulative errors of the trial court. To support this claim, Kalisz relies on State v. Dixon in which this Court outlined the five steps between conviction and imposition of the death penalty that provide “concrete safeguards beyond those of the trial system to protect [the defendant] from death where a less harsh punishment might be sufficient.” Dixon, 283 So.2d 1, 7-9 (Fla.1973).[11] Kalisz’s vague *212 assertion that each step in the Dixon analysis was compromised by the actions of the trial court is insufficient to merit relief.
Although we have disapproved the trial court’s finding as to two of the six aggravating circumstances, we also conclude that these errors were harmless because the other four aggravating circumstances were established. Given the compelling evidence of guilt and the weighty aggravating circumstances applicable to this case, there is no reasonable probability that the jury would have found that the death penalty was an improper sentence even if the jury had not been instructed on the two inapplicable aggravating circumstances.
Constitutionality of Florida’s Death Penalty Statute
Kalisz raises multiple challenges to the constitutionality of Florida’s death penalty statute. We deny relief on this claim for a number of reasons. First, this Court has repeatedly held that Florida’s capital sentencing scheme does not violate the United States Constitution under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). See, e.g., Abdool v. State, 53 So.3d 208, 228 (Fla.2010) (“This Court has also rejected [the] argument that this Court should revisit its opinions in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), and King v. Moore, 831 So.2d 143 (Fla.2002).”), cert. denied, — U.S. -, 132 S.Ct. 149, 181 L.Ed.2d 66 (2011). Likewise, this Court has also “repeatedly rejected” objections based on Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), to Florida’s standard jury instructions. McCray v. State, 71 So.3d 848, 879 (Fla.2011), cert. denied, — U.S. -, 132 S.Ct. 1743, 182 L.Ed.2d 536 (2012); Smithers v. State, 18 So.3d 460, 472 (Fla.2009); Smith v. State, 998 So.2d 516, 530 (Fla.2008).
Second, “[t]his Court has repeatedly held that Ring does not apply to cases when the prior violent felony, the prior capital felony, or the under-sentence-of-imprisonment aggravating factor is applicable.” Hodges v. State, 55 So.3d 515, 540 (Fla.2010), cert. denied, — U.S. -, 132 S.Ct. 164, 181 L.Ed.2d 77 (2011). This Court has also held that Ring does not apply where the capital felony was committed while the defendant was engaged in the commission of a felony, such as burglary. See Ellerbee v. State, 87 So.3d 730, 747 (Fla.2012), cert. denied, — U.S. -, 133 S.Ct. 844, 184 L.Ed.2d 667 (2013); see also § 921.141(5)(d), Fla. Stat. (2010). All four factors were found by the trial court here and they are supported by the record.
Third, the jury unanimously recommended the death sentence, and this Court has previously rejected Ring claims in cases involving such recommendations of death. See Crain v. State, 894 So.2d 59, 78 (Fla.2004); Caballero v. State, 851 So.2d 655, 663 (Fla.2003). Accordingly, under this Court’s precedent, Kalisz is not entitled to relief under Ring.
Proportionality
This Court has described its obligation to conduct a proportionality review as follows:
Due to the uniqueness and finality of death, this Court addresses the propriety of all death sentences in a propor *213 tionality review. Hurst v. State, 819 So.2d 689, 700 (Fla.2002). In determining whether death is a proportionate penalty in a given case, we have explained our standard of review as follows:
“[W]e make a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.” We consider the totality of the circumstances of the case and compare the case to other capital cases. This entails “a qualitative review by this Court of the underlying basis for each aggravator and miti-gator rather than a quantitative analysis.” In other words, proportionality review “is not a comparison between the number of aggravating and mitigating circumstances.”
Williams v. State, 37 So.3d 187, 205 (Fla.2010) (quoting Offord v. State, 959 So.2d 187, 191 (Fla.2007)). Thus, our proportionality review requires that we discretely analyze the nature and weight of the underlying facts; we do not engage in a “ ‘mere tabulation’ of the aggravating and mitigating factors.” Terry v. State, 668 So.2d 954, 965 (Fla.1996) (quoting Francis v. Dugger, 908 F.2d 696, 705 (11th Cir.1990)).
Scott v. State, 66 So.3d 923, 934-35 (Fla.2011).
Here, the jury unanimously recommended that Kalisz be sentenced to death for the murders of Kathryn and Deborah. The trial court properly found four aggravating circumstances: (1) the capital felony was committed by a person previously convicted of a felony and under sentence of imprisonment or placed on community control or on felony probation (great weight); (2) Kalisz was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person (great weight); (3) the capital felony was committed while Kalisz was engaged in the commission of a burglary (moderate weight); and (4) CCP (great weight).
The trial court found that Kalisz had proven the statutory mitigating circumstance that the capital felonies were committed while he was under the influence of extreme mental or emotional disturbance, but gave it little weight. The trial court also found three nonstatutory mitigating circumstances: (1) Kalisz has a long, well-documented history of alcohol and drug abuse (some weight); (2) Kalisz successfully overcame his alcohol addiction (some weight); and (3) Kalisz helped others through Alcoholics Anonymous, maintained gainful employment, and performed kind and generous deeds for others (little weight).
Precedent supports Kalisz’s death sentences as proportionate given that the trial court properly found four aggravating circumstances, two of which are among the most serious aggravating circumstances— CCP and prior violent felony. See Buzia v. State, 82 So.3d 784, 800 (Fla.2011); Chamberlain v. State, 881 So.2d 1087, 1109 (Fla.2004). In Wright v. State, this Court noted that “the CCP aggravator is one of the most serious aggravators provided by the statutory scheme,” and upheld the imposition of death where the trial court found four statutory aggravating circumstances and three statutory mitigating circumstances. Wright, 19 So.3d 277, 304 (Fla.2009); see also Larkins v. State, 739 So.2d 90, 95 (Fla.1999). This Court has held the sentence of death to be proportionate where two aggravating circumstances, CCP and previous capital/violent felony, were weighed against five statutory mitigating circumstances. See Diaz v. State, 860 So.2d 960, 971 (Fla.2003); see *214 also Heath v. State, 648 So.2d 660, 663 (Fla.1994) (holding death sentence proportionate where the aggravating factors of prior violent felony and murder committed during course of a robbery were balanced against statutory mitigating factor of extreme mental or emotional disturbance and several non-statutory mitigating circumstances).
Based on our assessment, of the totality of the circumstances, the number and severity of the crimes committed by Kalisz, and comparable case law, we hold that the imposition of the death penalty in this case is proportionate and supported by the applicable aggravating and mitigating factors.
Sufficiency of the Evidence
This Court has a mandatory obligation to independently review the sufficiency of the evidence in every case in which a sentence of death has been imposed. See Blake v. State, 972 So.2d 839, 850 (Fla.2007); Fla.R.App. P. 9.142(a)(5). This Court must assess whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt. Bradley v. State, 787 So.2d 732, 738 (Fla.2001) (citing Banks v. State, 732 So.2d 1065, 1067 n. 5 (Fla.1999)).
The record provides more than sufficient evidence to support the convictions of Kal-isz for murder in the first degree, attempted first-degree murder with a firearm, and burglary of a dwelling with a firearm. The record reflects that the night before the murders Kalisz, a recovering alcoholic, arrived at his friend’s home with a bottle of intoxicating liquor. Kalisz was driving the same vehicle as that which was reported outside Kathryn’s home at the time of the murders and in which he was apprehended by authorities following the shootout with law enforcement in Dixie County. His friend stated that Kalisz consumed alcohol over the course of the evening and alluded to plans to harm his sister and niece, both of whom he appeared to blame for his legal and financial problems. Kal-isz displayed aggressive tendencies when he told his friend that he would shoot himself and others if anyone tried to stop him.
On the day of the murders, Kalisz visited the location where an acquaintance worked and appeared to be driving the same vehicle that was later reported outside of Kathryn’s home. Kalisz showed the acquaintance a black, semi-automatic nine-millimeter handgun fitted with a red dot laser sight. Kalisz proceeded to engage in target practice until the acquaintance requested that Kalisz leave the property. During trial, law enforcement and forensic personnel provided testimony that appears to establish the handgun, projectiles, and cartridges recovered from Kathryn’s residence, the victims, and the filling station were fired from the nine-millimeter handgun recovered from Kalisz when he was apprehended by authorities.
After Kalisz finished target practice, he drove his vehicle to his sister Kathryn’s home. A neighbor of Kathryn’s testified that she had noticed a white Ford vehicle with Colorado license plates outside Kathryn’s residence before law enforcement arrived. Thereafter, Kalisz entered the home and shot Kathryn. He then went outside and shot Deborah, Manessa, and Amy. Kathryn and Deborah died; Manes-sa and Amy survived.
During trial, Manessa, who is Kalisz’s niece, and Amy provided eye-witness identifications of Kalisz as the man who shot them and killed Kathryn and Deborah. While in the hospital, Kalisz confessed to law enforcement that he had attempted to eliminate his sister “and her blood line” because they were responsible for his legal *215 and financial problems. As previously discussed, Kalisz does not contest his guilt, only the imposition of the death penalty.
Accordingly, we hold that there is sufficient evidence in the record to support Kalisz’s convictions.
CONCLUSION
Based on the foregoing, we affirm Kal-isz’s convictions and sentences.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

. The victims are referred to by their first names to eliminate confusion.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Additionally, the defense did not challenge the recording of the interview.

. This part of the interview transpired as follows:
FAULKINGHAM: How come you didn't do it before you went over to Kitty’s house[?]
KALISZ: Then I might not have got Kitty.
FAULKINGHAM: Was Kitty your main objective?
KALISZ: Yeah.
FAULKINGHAM: What made you finally decide to carry on your plan? What made you decide that ... the catalyst was today? What made you decide that that was the day?
KALISZ: I think the State of Florida said you can’t let me back.

. A gas inspector confirmed that the explosion that caused the destruction of Kalisz’s home was an accident.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. This aggravating circumstance was based upon Kalisz’s murder of Captain Reed in Dixie County, the contemporaneous first-degree murders of Kathryn and Deborah, and the contemporaneous, attempted first-degree murders of Manessa and Amy.

. The video recording provided with the record on appeal does not begin until after De *200 tective Faulkingham read Kalisz his Miranda rights.

. This comment appears to relate to the circumstances of Kalisz’s 2009 conviction and resulting probation for contributing to the delinquency of a minor and aggravated assault with a deadly weapon. Although the delinquency-of-a-minor charge was referenced during the guilt phase of the trial because Kalisz’s interview was admitted and it alluded to this charge, the State did not directly address this charge during trial. In contrast, Kalisz's aggravated assault charge was directly addressed by the State during the penalty phase when Kalisz's probation officer testified and verified his probationary status for this charge. The sentencing order, however, references both criminal convictions as aggravating circumstances.

. The State also alleges that the trial court appropriately found this aggravator because of the shoot-out in Dixie County at the filling station. However, the Dixie County incident was handled in a separate criminal proceeding. Further, the trial court did not address this incident in its sentencing order when finding this aggravator. Consequently, we will not bootstrap the fact that Kalisz created a great risk of death to those officers to the circumstances of the instant case.

. The five steps are: (1) the question of punishment is reserved for a post-conviction hearing where the State and defense are permitted to present evidence so the trial court and jury can hear other information regarding the defendant and the crime for which he *212 or she has been convicted before determining whether death will be required; (2) a jury hears new evidence presented at the postcon-viction hearing and provides a recommendation as to penalty; (3) the trial court determines the sentence to be imposed — guided by, but not bound by, the findings of the jury; (4) the trial court justifies the sentence of death in writing to provide meaningful review by this Court; and (5) the trial court propounds aggravating and mitigating circumstances which must be determinative of the sentence imposed. See Dixon, 283 So.2d at 7-9.