696 So.2d 317 (1997)
Ronnie JOHNSON, Appellant,
v.
STATE of Florida, Appellee.
No. 80278.
Supreme Court of Florida.
May 8, 1997.
Rehearing Denied June 26, 1997.
*319 John H. Lipinski and Maria Brea Lipinski, Miami, for Appellant.
Robert A. Butterworth, Attorney General and Fariba N. Komeily, Assistant Attorney General, Miami, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Ronnie Johnson. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm both his conviction of first-degree murder and the death sentence subsequently imposed.
The record reflects the following. Lee Arthur Lawrence was murdered on March 20, 1989. Four suspects were charged in the crime. Ronnie Johnson and Bobbie Robinson were convicted, in separate trials, of first-degree murder and sentenced to death.[1] David Ingraham was convicted of first-degree murder and sentenced to life in prison. Rodney Newsome was convicted of seconddegree murder and sentenced to twenty-two years in prison.
The relevant incident occurred in the evening of March 20, 1989, at Lee's Grocery in Dade County. Working in the store at the time of the shooting were Valerie Briggs[2] and Juanita Meyers.[3] Bernard Williams had come to the store with his dog.[4] He was Meyers' boyfriend. Before closing time, Briggs asked Meyers to take the trash outside. At that time, the owner (and victim) Lawrence left his office and went to the parking lot. Williams also exited to check on his dog.[5] Outside, customer Josias Dukes was using a telephone. Due to his vantage point, Dukes was able to identify Ingraham as the perpetrator who carried the Uzi, a semiautomatic firearm. With these persons present, the violence began. Ingraham opened fire on Bernard Williams. Williams was hit in the back and fell to the ground. Ingraham then shot at Lawrence. Lawrence also fell to the ground. At this point, Johnson exited the store (he had been making a purchase inside) and started firing his revolver at Lawrence. Ingraham started firing shots at Dukes. Both Ingraham and Johnson fired stray shots in various directions. Lawrence was killed in this incident. Neither Dukes nor Williams died.
Johnson subsequently confessed to multiple crimes. In his confession, Johnson indicated that "G" had hired him to murder Lawrence. The victim was targeted because of his anti-drug efforts in the community. Johnson stated that he had been offered $1500 to commit the murder.
Prior to trial, Johnson moved to suppress the confession.[6] A hearing on the motion was held on June 28, 1991. A total of five persons testified at the hearing. The defense called Johnson. The State called Milton Hull, Gregg Smith, Thomas Romagni, and Danny Borrego.
Officer Hull testified that he found Johnson on his grandmother's porch eating a hot sausage on April 1, 1989. Hull called Johnson over to him. It was a little after 6 p.m. Hull told Johnson that some investigators wanted to talk to him about a murder. If Johnson was willing, Hull would take him to the investigators and bring him back. Actually, *320 however, other detectives transported Johnson after he agreed to go. Hull testified that Johnson was not handcuffed when he was transported. Detective Gregory Smith also testified that Johnson was not handcuffed when he was transported to the Team Police Office. At that point, Johnson signed a[7] Metropolitan Dade County Police Department Miranda warning form. Detective Thomas Romagni testified that he witnessed Johnson sign this form. Romagni stated that Johnson was not handcuffed when the Miranda form was read to him. Detective Danny Borrego then testified that, prior to the signing of the Miranda form, he ascertained that Johnson understood the English language, could read, and was not under the influence of drugs or narcotics. In sum, all four officers expressly testified that they neither threatened Johnson nor promised him anything. On the other hand, Johnson testified that he was handcuffed while being taken to headquarters. He also said that he was told he could avoid the electric chair by cooperating. Johnson stated that he was punched in the chest and arms by investigators during the questioning. Johnson testified that he asked to speak with his family. He says that he was told he could do so only after "what they were doing was over with." Further, he testified that he was scared for his family when he signed the sworn statement.
The motion to suppress was denied. The case proceeded to trial. The jury convicted Johnson of first-degree murder for the death of Lawrence, attempted first-degree murder in the shooting of Williams, and aggravated assault in the shooting towards Dukes. After hearing penalty-phase evidence, the jury recommended that a death sentence be imposed by a margin of seven to five. The trial judge then sentenced Johnson to death on July 16, 1992. In his sentencing order, he found the following four statutory aggravating circumstances: (1) prior violent felony convictions;[8] (2) great risk of death to many persons;[9] (3) the murder was committed for pecuniary gain;[10] and (4) the murder was committed in a cold, calculated, and premeditated manner with no pretense of moral or legal justification.[11] The trial judge then considered the following two statutory mitigating factors: (1) that the defendant was under the influence of extreme mental or emotional disturbance at the time of the crime;[12] and (2) the age of the defendant at the time of the crime.[13] The trial judge rejected both of these factors. As for nonstatutory mitigation, the judge found that it was established that Johnson is a good friend and a man who cares for his family. The judge concluded as follows:
But this mitigating evidence is overwhelmingly outweighed by the aggravating circumstances. After presiding at three trials of this Defendant, this Court has come to the conclusion that he is a man who murders people for money. This Court has searched the record and its conscience to find a reason for not imposing the death penalty and has found none.
A sentence of death was imposed. This direct appeal ensues. Johnson raises five issues on appeal. We find no merit in any of these issues.
First, Johnson claims that the trial court erred in denying the motion to suppress his confession. As stated, a single hearing was held to determine the admissibility of the confession in all cases involving Johnson. We have analyzed Johnson's claim that his *321 motion to suppress should have been granted in Johnson v. State, 696 So.2d 326 (Fla.1997). We adopt by reference the reasoning and analysis in case No. 79,383 and, accordingly, find no error in the trial court's denial of the motion to suppress.
As his third[14] issue, Johnson complains of improprieties in jury discussions. The trial judge, according to Johnson, erred by failing to declare a mistrial after it was revealed that jurors had improperly communicated with one another. The incident that gave rise to the revelations at issue took place on the morning of May 19, 1992. Juror Layow approached a table where numerous people were sitting. The following account of the incident was given to the judge by Ben Daniel and David Finger.
THE COURT: Mr. Finger, as I understand it, there was a member of our jury panel in the Johnson matter that approached you and Mr. Daniel and asked you some questions?
MR. FINGER: What happened this morning is, we were sitting at table, I was sitting there with Mr. Daniel, also at this table I believe was Mr. Peckins, a private attorney, Tam Wilson, a Circuit Judge, Barry Hodes was still at the table, Emockul Stuart, a private attorney.
We were sitting around having a conversation and a juror comes up and basically interrupts our conversation and inquires if we are attorneys, we indicated, yes.
Then her question was, "Would you mind telling me how long a defendant would serve on a life sentence?"
I recall Mr. Daniel responded, "Well, it depends, what kind of life sentence?"
Then she said, "First degree murder."
Mr. Daniel indicated, "Well, it is a 25 year minimum."
She asked what that means, "25 years without [parole]?"
I recall saying, "What difference does that make, it is not supposed to matter what the penalty is.
Are you a juror?"
Then she said, yes, she is a juror.
"Well, you better tell the Judge."
She left rather rapidly.
Ben Daniel and I and the other guys, rather than leave it to her to bring it to the [court's] attention, we thought we could try to figure out what panel she was sitting on. We realized that [answer].
Based upon this statement to the trial court, Juror Layow was dismissed from the jury. Alternate Salva was named to replace her. The defense, at this point, expressed doubts to the judge as to whether the jurors were being completely candid. The State agreed that a separate voir dire of all jurors would be appropriate. The State suggested that the questions be limited to whether "they have had any conversation with Ms. Layow or whatever." The trial court allowed such individual voir dire to occur. Jurors Quinata, Salva, Carlton, Bruton, Dobson, Delgado, Stone, Preval, Burke, and Kleppenger all testified that they had engaged in no conversations with fellow jurors. Johnson, however, bases his claim on the following testimony from jurors Blanca and Gomez.
Q [Court]: Your name is?
A: Blanca.
Q: Mrs. Blanca, have you had any conversation with Ms. Layow about any matter relating to this case or penalties or anything like that?
A: No, we talked about names, we were confused about names.
Q: That is it? Have you had any conversation with any other member of the jury or any other person about this case?
A: No.
Q: Any questions?
Q [Badini]: What names?
A: Well, we are all confused. There were so many names and nicknames that we got confused at a point.
Q: That is discussion of the case, Judge.

*322 Q: Just elaborate. I would ask you to be as [candid] as possible. This was a discussion about names?
A: I can't remember what you asked, but there was something, Blue, Black, I don't know, Boo, and so many other names. We didn't know who was who.
Q: Some of the jurors told you who they recalled who was who?
A: Yes.
Q: Did any of the jurors talk anything more about that?
A: Not in front of me.
....
Q [Court]: You are Mr.
A: Gomez, Guillermo.
Q: Mr. Gomez, have you had any discussions with Ms. Layow about any matter relating to this case, such as the possible penalty or anything like that?
A: None whatsoever.
Q: Any conversation with anybody?
A: Not to that regard, no.
Q: What kind of conversation have you had?
A: We have talked about the person that got shot. We said it was pretty traumatic, the bullet wounds on him. We discussed other matters, like the [doctor's] opinion, it was really interesting hearing the way he talked and how he explained things real well. I don't know who Ms. Layow is.
Q: What was the other conversation you had?
A: That is about it. Yesterday everybody was talking about other things. Some lady said, I don't think we should be discussing this matter anymore, so everybody stayed quiet. We were trying to discuss the foreperson. The first lady that came in, I think she should be the foreperson in the trial.
Q: What else, what other discussions have you had?
A: I can't recall anything else.
Q: Any questions?
Q [Badini]: I appreciate you being [candid]. You said you have had discussions with the jurors concerning the [doctor's] testimony?
A: Well, not with the jurors, the short black man that I sit next to, we were talking about it yesterday.
Q: He is a member of the jury?
A: Yes sir.
Q [State]: Mr. Gomez, has there been any discussion whatsoever about whether or not the defendant was guilty or not guilty of the charges?
A: There has been a discussion stating in a way that he had admitted his [g]uilt in a way, with that white paper. So we were like saying the evidence in front of us, it was difficult to say that the man is guilty or not guilty, we have to have an open mind.
Everybody is saying that nobody is admitting he is guilty, but they are confused in a way because no one can ask questions, and everybody is like, I wish we can ask these type of questions, this type of question. There is a little confusion there.
Q: Has, in any of the discussions, anyone made up their minds about the defendant being guilty or not guilty?
A: Not at all. I haven't heard anybody say he is guilty. As a matter of fact, I said, you have to have an open mind to what we heard, all the evidence. I didn't know what this part of the trial was going to be. I haven't heard anybody say he is guilty.
Q [Court]: What were the other discussions you had?
A: That is about it. The only other discussion was that we are bored to be here, can't wait until it is over, stuff like that.
Q [Badini]: Do you recall, other than the black man sitting next to you, I don't remember his name offhand
Q [Court]: Mr. Preval?
Q [Badini]: By name or description, some of the other jurors you may have had a conversation with?
A: Basically the other time when I was reading the calendar, I told her we can't be looking at anything. That you can't do this, you can't do that, so everybody is aware of it.
*323 It is axiomatic that jurors should not discuss a case among themselves prior to deliberations. The instant jury was well aware of such a prohibition. The following instruction was given at the outset of the trial:
You will not get the definition on the merits of the case until you heard all the evidence, the arguments from the attorneys and the instructions on the law by myself. Until that time you should not discuss the case among yourselves.

Now, during the course of the trial we may be taking recesses, during which time you may separate and go about your personal affairs. Now, during these recesses you will not discuss the case with anyone, you are not to talk to witnesses nor the attorneys. If anyone comes up to you and they want to know something about this case, or attempt to say anything to you or in your presence, you are to tell that individual that you are on the jury trying this case, and ask them to stop. If they persist, report the matter to the bailiff and he will report it to me.
This case is only to be tried by you only in the presence of the defendant and the attorneys and myself. You must not conduct any investigation of your own. This means, you must not visit any of the places described in the evidence, you must not read or listen to any reports about this case.

Furthermore, you must not discuss the case with any person, you must not speak to the attorneys, the witnesses, or the defendant, about any subject until your deliberations are complete.
(Emphasis added.) There can be no doubt that the jurors were aware that they should not discuss the case prior to deliberations. The fact that discussions did, in fact, take place clearly indicates an impropriety. See Amazon v. State, 487 So.2d 8, 11-12 (Fla. 1986) (indicating that a juror's comment to an alternate juror was more than improper, it was indeed presumptively prejudicial); Scott v. State, 619 So.2d 508, 509 (Fla. 3rd DCA 1993) (labeling premature deliberations, in the form of jury comments, as improper); Brooks v. Herndon Ambulance Service, 510 So.2d 1220, 1221 (Fla. 5th DCA 1987) (finding premature jury discussions to be improper). We have said that, once a prima facie case of potential prejudice has been established, the burden is on the State to rebut the a presumption of prejudice. Amazon, 487 So.2d at 11. We find that the conversations referenced by Mr. Gomez and Mrs. Blanca establish a prima facie case of potential prejudice. We must, therefore, determine whether the nature of the occurrences rebuts the presumption. Each specific item of conversation will be addressed individually. First, Mrs. Blanca spoke of a conversation as to confusion about names. In particular, Mrs. Blanca said she was confused by the many nicknames such as "Blue," "Black," "Boo," and so forth. She testified that other jurors clarified the confusion. Certainly it was no secret that Johnson was also known as "Boo." In fact, the indictment listed "Boo" as an alias for Johnson. Mrs. Blanca's question went no further than a question actually asked by Johnson's defense attorney. Mr. Badini engaged officer Borrego in the following cross-examination:
Q: It has been a long trial, I am getting confused. What is first confusing me are the nicknames, Boopie, Blue, Black, whatever. Boopie is who again?
A: Boopie is David Ingra[ham].
Q: See, you had to pause for a second.
A: Just to make sure.
Q: My client, Ronnie Johnson, is sometimes called Boo?
A: He was called Black.
Q: He has also been indicted under the name Ronnie Boo?
A: Correct.
In these circumstances, Mrs. Blanca was not even commenting or asking for comment on evidence. She was simply asking for the information provided by Borrego's clarification. While still improper, it is incredible to assert that such a question could influence the outcome of the trial. There is no claim that the names "Boo" and "Black" do not refer to Johnson. The appropriate nickname for Johnson, from among the many heard by the jury, was not contested and did not directly affect any decision the jury was faced *324 with. We find that Johnson was not prejudiced by the improper conduct revealed by Mrs. Blanca.
We move next to the conversations referenced by Mr. Gomez. He stated that he spoke with the juror seated next to him about the doctor's testimony as to the wounds suffered by the victim.[15] Gomez stated that they talked about the "traumatic" nature of the wounds suffered by the victim. They also talked about the good explanation given by the doctors. We find that these comments are similar to the challenged comment in Amazon. There, one juror told an alternate juror that certain witness testimony was "impressive." We found that, although the jurors acted improperly, their discussion could not have conceivably influenced the result. Amazon, 487 So.2d at 12. It is important to remember that the jury saw the doctor testify. The comments at issue here were simply a reaction to that testimony. There is no indication that any extrinsic information was imparted to the jury.[16] Much like we found in Amazon, it is simply unrealistic to imagine that this limited conversation between Mr. Gomez and the juror seated next to him indicates that either had formed a premature opinion about the case. Id. While we must recognize that the jurors' conduct in this case was improper, we must stop short of finding all human errors to be prejudicial to the defendant. Therefore, we find that the conversation as to the doctor's testimony and the traumatic nature of the victim's wounds was not prejudicial to the defendant. The same result is reached when we analyze the testimony as to the premature discussion of a jury foreperson. Mr. Gomez stated that the jurors discussed the jury foreperson before deliberations. Such discussion was improper. Certainly, though, it goes to no issue in the case. It therefore could not have influenced the result. We find that the defendant was not prejudiced by this conversation.
Lastly, Mr. Gomez testified that the jury had joined in a discussion about the meaning of the white paper (confession). Mr. Gomez, while being very candid, also expressly testified that none of the jurors had forwarded a premature opinion that Johnson was guilty. In fact, he stressed that the jury agreed that they had to have an "open mind." He further testified that "[e]verybody is saying that nobody is admitting he is guilty." To that end, Mr. Gomez stated that he had not heard any juror prematurely say that Johnson was guilty. It is natural for jurors not trained in the law to suffer confusion when a confession is introduced while the defense is proclaiming that the State has not satisfied its burden. Most jurors, no doubt, struggle internally with this conundrum. However, there was no justification for this jury to discuss its internal confusion. Once that improper discussion did take place, however, they commendably agreed among themselves to resolve their confusion in favor of the defendant and "keep an open mind." We cannot find that Johnson was prejudiced by this conversation. In sum, none of the improper juror conduct, even in aggregate, can withstand the record rebuttal[17] support that clearly demonstrates that the defendant was not prejudiced. The trial court did not abuse its discretion in denying Johnson's motion for mistrial.
As his fourth issue, Johnson claims that the trial judge erred in finding, in aggravation, that Johnson caused a great risk of death to many persons. We start by looking at the trial judge's sentencing order. In relevant part, it reads:

*325 Just prior to the shooting outside of Mr. Lawrence's grocery store, Juanita Myers[,] a store employee[,] had gone outside to take out the trash. Valerie [Briggs], another employee, remained inside the store. Josias Dukes was making a phone call [from] an outside pay phone and Bernard Williams was in the area with his dog. The Defendant was inside the store and [David] Ingraham was outside. When Mr. Lawrence stepped outside his store, Ingraham opened [fire] on him with his Uzi. The Defendant came outside and opened fire. Several shots were fired at Josias Dukes who managed to escape injury. Bernard Williams sustained serious gunshot wounds but survived. Ms. Myers lay flat on the ground and managed to avoid drawing fire.
Besides Mr. Lawrence, the lives of four people were placed in peril because of the murderous acts of the Defendant.
We have stated that this aggravator cannot be supported in situations where death to many people is merely a possibility. Instead, there must be a likelihood or high probability of death to many people. Jackson v. State, 599 So.2d 103, 109 (Fla.1992); Scull v. State, 533 So.2d 1137, 1141 (Fla.1988); King v. State, 514 So.2d 354, 360 (Fla.1987); Lusk v. State, 446 So.2d 1038, 1042 (Fla.1984); Kampff v. State, 371 So.2d 1007, 1009 (Fla. 1979). Further, we have indicated that the word "many" must be read plainly. Therefore, we uphold the application of this aggravating circumstance in scenarios in which four or more persons other than the victim are threatened with a great risk of death. Cf. Alvin v. State, 548 So.2d 1112, 1115 (Fla. 1989) (finding the great risk aggravator unjustified in situation where four people were in the vicinity of the shooting and one of those was the victim); Bello v. State, 547 So.2d 914 (Fla.1989) (holding great risk posed to three persons other than the victim insufficient to justify great risk aggravator).
With these guidelines in mind, we look to the specific facts of this case. Those facts clearly show that the challenged aggravator is appropriate. First, Johnson's confession indicates that the plan from the outset was to "spray up the store." They were to do this so that the police investigators would think the shooting was drug-related. Further, it is obvious from the record that Johnson recruited the participation of both Ingraham and Newsome. In this sense, he was the leader. The record reflects that Johnson was well aware that persons other than Lawrence would be present at the time of attack. Other people were indeed present. Briggs was inside the store. Dukes was on the phone. Bernard Williams was actually shot. Williams' dog was also shot. A bullet retrieved from the dog was consistent with the type that would be fired by the gun Johnson carried. It was inconsistent with the bullets fired by an Uzi. Myers was trapped between Lawrence and Williams. The record indicates that Johnson fired his gun both into the store and across the parking lot. We find that such random "spraying" of bullets, in the presence of at least four other people (victim excluded) did cause a great risk of death to many persons. Therefore, we find no error in the trial judge's determination that this statutory aggravator did, in fact, exist. We also hold that, if we assume arguendo that this aggravator was mistakenly found, such error is harmless beyond a reasonable doubt in light of the existence of three other statutory aggravating circumstances. See Coney v. State, 653 So.2d 1009, 1015 (Fla.1995) (holding that error in finding existence of great risk aggravating factor was harmless beyond a reasonable doubt in light of four other statutory aggravators). In fact, the sentencing order in this case uses stronger language than that relied upon in Coney to justify the finding of harmless error. There, the judge wrote that "there are more than sufficient aggravating circumstances proven beyond a reasonable doubt to justify the imposition of the death penalty." Id. Here, the trial judge wrote that the "mitigating circumstance is overwhelmingly outweighed by the aggravating circumstances. After presiding at three trials of this Defendant, this Court has come to the conclusion that he is a man who murders people for money." In sum, we find that Johnson is entitled to no relief on this claim.
Finally, Johnson argues that his death sentence is disproportionate in light of the resolution reached in the case against co-defendant Ingraham. Specifically, Johnson points out that Ingraham received a life sentence for his participation in the attack. *326 Johnson avers that the facts of this case demonstrate that he is no more culpable than Ingraham. Johnson's rights to equal protection and due process are violated, he claims, if his death sentence is not vacated. We disagree. It is not disputed that Johnson was a triggerman. It also is clear that the balance of aggravation and mitigation in this case supports the imposition of the death sentence. Further, we find unconvincing Johnson's efforts to equate Ingraham's culpability with his own. As we have stated, Johnson was the leader of the attack. He recruited Ingraham and Newsome to participate. Indeed, the trial judge accurately reported in his order that Johnson "hired accomplices, arranged to get the murder weapons and arranged transportation to and from the murder scene." In view of his greater culpability, there is nothing disproportionate about his sentence. Larzelere v. State, 676 So.2d 394, 407 (Fla.), cert. denied, ___ U.S. ___, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996); Hayes v. State, 581 So.2d 121, 127 (Fla.1991); Downs v. State, 572 So.2d 895, 901 (Fla.1990). Accordingly, we find no merit in this claim.
For the reasons expressed, we affirm both Johnson's conviction of first-degree murder and the subsequent sentence of death imposed by the trial court.
It is so ordered.
OVERTON, SHAW, GRIMES, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] Ronnie Johnson faces another death sentence in case No. 79,383. In that case, he was convicted of murdering Tequila Larkins. Both cases involve murders-for-hire.
[2] Valerie Briggs was also in the laundromat in which Tequila Larkins was murdered on March 11, 1989.
[3] Apparently "Tyrone" also worked that day. There is no indication that he witnessed the murder.
[4] The dog was killed during this shooting incident.
[5] It must be noted that there is testimony that Johnnie Williams (as well as Bernard Williams) was also within 100 feet of the shooting.
[6] While Johnson was tried separately for the murders of Tequila Larkins and Lee Arthur Lawrence, a single hearing was held on the motion to suppress Johnson's confession to both murders.
[7] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[8] § 921.141(5)(b), Fla.Stat. (1987).
[9] Id. § 921.141(5)(c).
[10] Id. § 921.141(5)(f).
[11] Id. § 921.141(5)(i).
[12] Id. § 921.141(6)(b).
[13] Id. § 921.141(6)(g). The judge rejected age as mitigation stating that "[h]e was mature enough to know that killing for money is a particularly horrifying way of committing civilization's oldest and most heinous crime." The judge was under the impression that Johnson was twenty-two at the time of the crime. The record reflects that he was only twenty-one. The crime was committed on March 20, 1989. Johnson was born on July 13, 1967. This discrepancy, though, does not alter the validity and trustworthiness of the judge's decision.
[14] In this case, Johnson treats his complaint about the absence of specific findings as a second issue. In case No. 79,383, the claim was framed as one aspect of a single suppression issue. Therefore, we choose to address his claims as they are numbered.
[15] His first mention of this conversation might indicate that many jurors were involved. Later in his testimony, though, he explains that the discussion was only with the juror seated next to him.
[16] The one exception is a reference to a calendar by Mr. Gomez. Such a calendar cannot be considered a case-related improper influence. While jurors must exercise the utmost caution in their conversations and associations while serving on the jury, we should not impose unreasonable constraints on everyday activities. Reading a calendar, without more, will not be considered improper in this case.
[17] Once again, we agree that Johnson has established a prima facie case of potentially prejudicial conduct. Johnson, therefore, is presumed to have suffered prejudice. The burden is on the State to rebut that prejudice.