# Third District Court of Appeal
## State of Florida

Opinion filed December 3, 2025.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D24-0684
Lower Tribunal No. 15-19010-CA-01
_____

**Dama Holding LLC,**
Appellant,

vs.

**Juan Guelmes,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Charles Kenneth Johnson, Judge.

GrayRobinson, P.A., and Jack R. Reiter; GrayRobinson, P.A., and Kristie Hatcher-Bolin (Lakeland), for appellant.

The Reyes Law Firm, P.A., and Israel Reyes and Christopher Reyes; Lauri Waldman Ross, P.A., and Lauri Waldman Ross, for appellee.

Before EMAS, LOGUE and MILLER, JJ.

EMAS, J.

## INTRODUCTION

Following a jury trial, the trial court entered an Amended Final Judgment in favor of Juan Guelmes, the plaintiff in the action below. The defendant below, Dama Holding, LLC ("Dama") appeals that Amended Final Judgment, as well as an order denying Dama's Motion for Judgment as a Matter of Law or, alternatively, New Trial and Motion for In Camera Inspection of Preserved Juror Notebooks. For the reasons that follow, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

Dama owned several residential homes in a cul-de-sac in Homestead, Florida. Guelmes had been leasing one of those homes and, by August 29, 2014, he had been living in it for sixteen months. On that day, Guelmes was cleaning his car when an unknown assailant grabbed the chain around his neck and told Guelmes to give it to him. When Guelmes did not comply, the assailant shot him once in the shoulder. The two men began fighting, during which the assailant shot Guelmes three more times.

Guelmes filed suit against Dama, alleging Dama had a duty to maintain the premises in a reasonably safe condition; and that it failed to warn Guelmes a dangerous condition existed when it knew or reasonably should have known that the leased premises constituted a high crime area, that

numerous similar criminal acts and attacks had occurred in the area, and that such criminal acts were reasonably likely to be perpetrated on its invitees absent proper security.[1]

Dama denied that it had a duty to protect Guelmes from third-party criminal conduct, that such conduct was not foreseeable, and denied it had any constructive or actual knowledge of the alleged dangerous condition on the leased premises. Dama further asserted that Guelmes had or should have had knowledge of any potential harmful or offensive conduct resulting in his injuries and that his own actions contributed to his injuries.

The case proceeded to trial, and the jury rendered a verdict, finding Dama was negligent and was the sole legal cause of Guelmes' loss, injury or damage, and awarded Guelmes a total of $4 million. The trial court thereafter entered its Amended Final Judgment in favor of Guelmes. In addition, Dama moved for a judgment as a matter of law, or alternatively, for new trial, which was denied by the trial court.

Dama raises several issues in this appeal, contending (1) the trial court should have directed a verdict in its favor because Dama had no duty to

---

[1] Guelmes also asserted a gross negligence claim against Dama, and sought punitive damages, but the court later granted Dama's motion for directed verdict on this issue finding its conduct did not rise to the level of "conscious disregard."

prevent or to warn of criminal activity by third parties and that there was no evidence it had actual or constructive notice of criminal activity in the cul de sac or the surrounding neighborhood; (2) the trial court should have granted a new trial based on juror misconduct because the alternate juror admitted that she spoke with other jurors about the merits of the case before deliberations and Guelmes failed to rebut the presumption of prejudice resulting therefrom; and (3) the trial court should have granted a new trial based on multiple erroneous juror instructions.

### STANDARDS OF REVIEW

We review de novo the trial court's ruling on a motion for directed verdict. People's Trust Ins. Co. v. Hernandez, 400 So. 3d 744, 746 (Fla. 3d DCA 2024). In addition, "[w]hether a legal duty exists is a question of law subject to the de novo standard of review." Competitive Softball Promotions, Inc. v. Ayub, 245 So. 3d 893, 895 (Fla. 3d DCA 2018) (citation omitted). However, "in reviewing the trial court's denial of [a] motion for directed verdict . . . 'an appellate court must evaluate the evidence in the light most favorable to the non-moving party, drawing every reasonable inference flowing from the evidence in the nonmoving party's favor,' and 'if there is conflicting evidence or if different reasonable inferences may be drawn from the evidence, then the issue is factual and should be submitted to the jury for

4

resolution.'" Hernandez, 400 So. 3d at 747 (citations omitted); see also Medina v. 187th St. Apts., Ltd., 405 So. 2d 485, 486 (Fla. 3d DCA 1981) ("Where there is any evidence to justify a possible verdict for the non-moving party, even if a preponderance of the evidence favors the movant, a directed verdict is an encroachment on the province of the jury.").

**ANALYSIS AND DISCUSSION**

**The Duty Issue**

Evaluating the evidence in a light most favorable to Guelmes, and drawing every reasonable inference flowing from that evidence in Guelmes' favor, the trial court properly denied Dama's motion for directed verdict on the question of duty.

We begin with the legal question of whether Dama, as Guelmes' landlord, owed Guelmes a duty to maintain the premises in a reasonably safe condition and/or to warn him of foreseeable danger. Generally, "a landowner owes no duty to protect against unforeseeable criminal misconduct" on its property. Brownlee v. 22nd Ave. Apts., LLC, 389 So. 3d 695, 699 (Fla. 3d DCA 2024). However, a landowner does owe a duty to "protect an invitee from criminal acts of a third person," where the invitee proves "that the landowner had actual or constructive knowledge of prior, similar criminal acts committed upon invitees." Medina, 405 So. 2d at 486 (citation omitted);

5

Ameijeiras v. Metro. Dade Cty., 534 So. 2d 812, 813 (Fla. 3d DCA 1988) ("A landowner has a duty to protect an invitee on his premises from a criminal attack that is reasonably foreseeable.").

In addition, given the "special relationship" between a landlord and tenant, the "landlord has a duty to protect a tenant from reasonably foreseeable criminal conduct", which includes warning tenants about those foreseeable acts. T.W. v. Regal Trace, Ltd., 908 So. 2d 499, 503-05 (Fla. 4th DCA 2005); see also Czerwinski v. Sunrise Point Condo., 540 So. 2d 199 (Fla. 3d DCA 1989); Ten Assocs. v. McCutchen, 398 So. 2d 860, 861 (Fla. 3d DCA 1981); Holley v. Mt. Zion Terr. Apts., Inc., 382 So. 2d 98 (Fla. 3d DCA 1980) (where there was evidence that crime was foreseeable, it was proper for the jury to determine whether landlord discharged its duty to keep premises safe by taking security measures); Truog v. Mid-Am. Apt. Cmtys, Inc., 358 F.Supp.3d 1332 (M.D. Fla. 2019). Although a "general incidence of crime in the area" may be insufficient to put a landlord on constructive notice of a risk, see Menendez v. The Palms W. Condo. Ass'n, Inc., 736 So. 2d 58. 61 (Fla. 1st DCA 1999), "the landlord's knowledge of prior crimes—against both persons and property—is relevant to the issue of foreseeability, **even if the prior criminal acts are lesser crimes than the one committed against the plaintiff**." Czerwinski, 540 So. 2d at 201 (emphasis added).

6

In Czerwinski, id. at 200, a tenant of a condominium building was robbed and sexually assaulted in her apartment and she sued the condominium association for failing to secure and maintain the premises in a reasonably safe condition from foreseeable criminal acts of third persons. It was undisputed that, in the five years before the attack on this tenant, two violent crimes had occurred in the condominium parking lot (a rape and an armed robbery) and that the condominium association had actual knowledge of these crimes, as well as nine apartment burglaries. Id.

Of significance, this court in Czerwinski noted that the law does not "require that the prior crimes occur at the same location, on or about the premises, as the subsequent crime in order to be relevant to the foreseeability of the later crime." Id. at 201 (citing Paterson v. Deeb, 472 So. 2d 1210 (Fla. 1st DCA 1985) for the proposition that "evidence that the neighborhood was experiencing a substantial number of breaking and enterings was relevant to the foreseeability of sexual attack on tenant."). Czerwinski ultimately held: "Where there was a history of crimes occurring on the premises against persons and property, within a five-year span, the trial court erred in ruling that the attack on the appellant was not foreseeable as a matter of law." Id.

In addition, the issue of foreseeability may include incidents which occurred in the neighborhood, not just those on the premises where the incident occurred. See Bellevue v. Frenchy's S. Beach Café, Inc., 136 So. 3d 640, 644 (Fla. 2d DCA 2013) (agreeing with the Fourth DCA in Odice v. Pearson, 549 So. 2d 705 (Fla. 4th DCA 1989)[2] that "in order for a jury to determine if a property owner took reasonable precautions to protect persons on or about the premises from foreseeable criminal activity, **a plaintiff must be given the opportunity to establish the type of neighborhood where the incident took place**." (emphasis added)); see also Newell v. Best Sec. Sys., Inc., 560 So. 2d 395 (Fla. 4th DCA 1990) (holding it was error for trial court to exclude evidence of prior criminal incidents in the area).

---

[2] The Fourth District in Odice v. Pearson, 549 So. 2d 705 (Fla. 4th DCA 1989) reversed the trial court's entry of a directed verdict on the issue of the restaurant owner's duty to customer, and the trial court's exclusion of police reports of crimes committed off restaurant property in a "high crime area," holding: "The trial court committed reversible error by limiting the issue of foreseeability to crimes occurring on appellee's property and the adjacent sidewalk. Such ruling directly affected appellant's ability to establish appellees' failure to foresee criminal activity and take the necessary reasonable precautions to guard against crime on or about the restaurant premises." Id. at 706. The court further noted that "[f]oreseeability is a jury question," and that "[i]solating a particular property from its surrounding area forces a jury to decide the question of foreseeability in a vacuum, like telling the jurors a mugging took place outside a church named St. Patrick's and neglecting to say it's located in the midtown section of New York City." Id.

In the instant case, the parties stipulated to several facts prior to trial,[3] including that Dama had a non-delegable duty "to provide a reasonably safe premises, which includes the non-delegable duty to protect invitees from reasonably foreseeable criminal attacks." Dama argued only that, due to its affirmative defense of comparative fault, it intended to present evidence of Guelmes' potential comparative negligence and his own duty to ensure his safety at the leased residence. In addition, prior to trial, Dama withdrew several of its affirmative defenses, leaving only comparative negligence, set-off, assumption of risk, a lack of constructive or actual knowledge as to the alleged harmful and/or offensive conduct, and lack of control over premises.

Accordingly, on appeal, although Dama argues that the trial court, and not the jury, was required to determine whether it owed a duty to Guelmes, it is clear that the factual issue remaining at trial was whether the assailant's

---

[3] The parties stipulated that (1) there was a landlord-tenant relationship between Dama and Guelmes; (2) Dama owned five residential properties in a cul-de-sac and an additional five lots contiguous to those; (3) Dama maintained no records or documents pertaining to purchases intended to provide for the security and safety of the occupants of those properties; (4) Dama never installed security cameras or a gate, did not hire any type of security company or guard at the cul-de-sac properties, and never discussed the possibility of doing so; (5) Dama did not conduct a security survey of the property or surrounding properties prior to leasing its properties; (6) Dama did not consult with anyone regarding security needs at the properties; (7) Dama had no procedures or policies concerning the protection of lessees from violent crime; (8) Dama did not have a budget for security and never discussed creating a budget for same.

attack on Guelmes was "reasonably foreseeable." In such a case, and where, as here, the facts are in dispute regarding previous criminal activity in the area and defendant's knowledge of that activity, "foreseeability is a question for the jury to determine." Medina, 405 So. 2d at 486; see also Salerno v. Hart Fin. Corp., 521 So. 2d 234, 235 (Fla. 4th DCA 1988) (noting "foreseeability and causation are classically jury questions.").[4]

We therefore turn to the question of whether there was sufficient evidence to establish the existence of criminal activity in the area and Dama's knowledge of same, such that it was proper for the trial court to deny Dama's directed verdict motion and permit the jury to decide the question.

Prior to trial, the trial court ruled that the jury would be permitted to hear evidence regarding specific categories of crime occurring over the preceding

---

[4] In Menendez v. The Palms W. Condo. Ass'n, 736 So. 2d 58 (Fla. 1st DCA 1999), a case relied upon by Dama on appeal, the only evidence related to the issue of foreseeability was that the condominium complex was located in a "high crime area," and a "high number of burglaries and assaults" had taken place in the condominium. However, in Menendez, the trial court concluded, and the record supported, that there was no evidence that the defendant condominium association had actual or constructive knowledge of that fact. Although Dama argues similarly that here there was no evidence of its actual or constructive notice of the crimes in the area, the record belies this contention, as discussed *infra*.

five-year period, committed within the geographic "grid"[5] where the attack on Guelmes took place.

Guelmes' expert, Michael Zoovas testified as follows: (1) it is foreseeable for crime to continue occurring where a lot of crime, including lesser crimes, is committed at a particular location and no reasonable measures are taken to deter and prevent crime from occurring; (2) within the five-year period prior to the incident, 351 crimes had been committed within the relevant geographic grid, a number reflecting "a very, very high crime area," for one that was not very large and these crimes included robbery, armed robbery, theft, burglary, residential burglary, grand theft, auto theft, aggravated battery, attempted burglary, occupied burglary, and aggravated assault with firearm, blunt object, knife; (3) in total, in the five years before Guelmes' attack in the relevant grid, there were eight assaults, nineteen batteries, more than eighty thefts or burglaries, about 100 residential or auto burglaries, and six robberies; (4) on the Dama-owned properties in the cul de sac specifically, there was a residential burglary on November 17, 2009,

---

[5] As Zoovas testified, the grid system works by dividing the county into small cells or grids, each with an assigned number.  By use of this grid system, law enforcement agencies and crime analysts can measure the amount and type of criminal activity within a particular grid cell, allowing identification of high-crime and "hot spot" areas.  It can also be used to help forecast where criminal activity is more likely to occur, allowing for more efficient allocation of law enforcement resources.

an aggravated assault on June 28, 2010, burglary of a vehicle on September 7, 2010, burglary on October 11, 2010, burglary of an unoccupied residence on October 15, 2010, loitering/prowling and residential burglary on June 28, 2011 and October 17, 2011, and a residential burglary on January 8, 2013; (5) in the home rented by Guelmes there was a residential burglary and theft on January 3, 2011 and an occupied residential armed burglary on May 28, 2011 and a burglary and grand theft on April 10, 2012; (6) it was foreseeable that crime would continue to occur in this cul-de-sac neighborhood, based simply on the amount of crime in the area and in this exact location, with no reasonable standards to reasonably deter and prevent crime from occurring; (7) based on the crime in the area, Dama should have warned Guelmes and all their tenants about the prior crimes.

Zoovas also testified that, regarding the April 10, 2012 crime, it was reported by Dama's property manager, Frank Bejar, to the police and that Dama acknowledged (during the proceedings in the trial court) that it was generally aware of nonspecific crimes which had occurred within a five-mile radius of the subject property.[6] Zoovas noted that the fact that crimes had occurred in three of the five homes in the cul-de-sac was "very disturbing,"

---

[6] This was admitted by Dama and that admission was read to the jury at the beginning of trial.

12

and described the area as a "crime magnet." Zoovas opined that Dama was egregiously negligent by failing to alert its tenants about the crime in the neighborhood.

The deposition testimony of Oscar Callao (a Dama owner/manager) was read to the jury. He testified that Dama had no concern about security at the properties, that "we always spoke with the neighbors, and there was never any other incident. Nothing ever happened." He knew about the report of a broken/stolen air conditioner, but he considered that a minor crime and he didn't recall any criminal incidents after Dama purchased the properties, although Bejar, the property manager told him about a burglary at another home, but told him it was an "internal matter of the home and that we didn't have to get involved." He spoke with two of the tenants, but not about security or crimes and he never looked into whether the area was a high crime area. He never spoke to Guelmes about crime at the properties or anything else. When asked about several other incidents that happened at the properties while Dama owned them, he was not aware.

Dama's property manager, Frank Bejar, testified at trial. He testified that: there was no safety or security at the properties; he never spoke to Guelmes about security; he was not aware of any crimes occurring on the Dama property prior to his taking over; during his time there, there were only

13

two incidents, theft of appliances and theft of an AC coil from the exterior of a home.

Excerpts of Bejar's pretrial deposition were also read to the jury during trial. In his deposition, Bejar acknowledged that he never had any discussions with Guelmes about crime in the area because there was "no need" and that there were no security procedures in place for the cul-de-sac properties. He was of the belief that the landlord's only responsibility for security was providing a house alarm. The only crime he was aware of before the attack on Guelmes was the air conditioning theft at one of the Dama properties there and theft of appliances from one of the Dama homes under construction. He did not inform the residents about this crime. He does not know whether the area was a "high crime area," and he has never checked police records to make such a determination at any property. There were two more incidents of burglary at the Dama properties, of which he was unaware. He insists that the area is safe, despite the eight police reports he was shown regarding crimes on the Dama properties.

The deposition of Francisco Mazzarella—Dama's principal owner— was also read to the jury at trial. Mazzarella testified that: there was no security plan for the cul-de-sac properties; he never discussed crime in the area with the prior owner before Dama purchased those properties; he never

spoke with any tenants; and he never attempted to find out about crime at the properties or the area. He specifically testified: "I think the tenants should maintain the properties in a reasonably safe condition. That's how it's done in Venezuela which is a very unsafe country. I don't know how it's done in the United States." When asked if he thinks Dama should maintain its property in a reasonably safe condition, Mazzarella testified: "I don't think so."

When further questioned whether Dama would have warned Guelmes if it was aware of a dangerous condition at the Dama properties, Mazzarella responded: "I don't think that's Dama's responsibility. They learn about it through the newspapers or police and it is not Dama's responsibility. So I don't think it's its duty, the duty of Dama to inform about that especially when the owner of the property lives in Venezuela."

Mazzarella further explained that even if Dama were aware of dangerous conditions, it would have been "easier" for Guelmes to learn about this from a neighbor. He disagreed that Dama should take precautions as are reasonably necessary to protect its tenants.

Guelmes himself testified that he did ask Frank Bejar about the neighborhood before he rented the Dama property and was told that it was "calm."

15

At the close of the evidence, Dama moved for a directed verdict on the issue of foreseeability, asserting there was no evidence of prior similar crimes on the property where Guelmes was attacked or even on the Dama cul-de-sac properties,[7] and no evidence that Dama knew or should have known of crimes outside the cul-de-sac, which crimes were not violent crimes and not similar to the violent shooting of Guelmes. Dama also moved for a directed verdict on the duty to warn issue, asserting the criminal activity in the area was open and obvious, and alternatively, that Guelmes had equal or superior knowledge of the alleged dangerous condition.

The trial court denied the motion for directed verdict on the foreseeability issue and later denied Dama's motion for judgment in accordance with its earlier motion for directed verdict, finding "Defendant owed Plaintiff a duty of care because the attack on Mr. Guelmes was reasonably foreseeable based on evidence adduced at trial that demonstrated Defendant's actual and constructive knowledge of same, similar, and lesser property and person crimes that occurred on the Defendant's properties for years before the incident."

---

[7] Both experts agreed that the cul-de-sac properties were like a small homeowner's association, though they weren't formally so.

16

We affirm the trial court's decision to deny directed verdict on the foreseeability issue as it relates to Dama's duty. Even if we were to ignore the evidence of crimes which took place on the Dama properties, which they admitted they knew about (and about which they did not inform their tenants), there was evidence that many similar crimes had occurred in the neighborhood in the several years prior to the attack on Guelmes, and the question of foreseeability was properly for the jury to decide.[8]

**Juror Misconduct**

The trial court's decision to deny Dama's motion for new trial on the basis of juror misconduct is reviewed for an abuse of discretion. Alonso v. Ford Motor Co., 54 So. 3d 562, 565 (Fla. 3d DCA 2011).

During the trial, counsel for Dama observed some of the jurors passing notes. He brought this to the court's attention and the court spoke individually with each of the three jurors involved individually. One of the jurors—Alternate Juror Gloria Palacios—at first said the note was about lunch. When asked by the court if it was anything about the case, Palacios said "No, not

---

[8] Dama's own expert, John Groussman testified at trial that if at least two burglaries occurred on the Dama properties within a short period of time, Dama should have let the tenants know. There was evidence that at least two burglaries did occur on Dama properties within a short period of time, even though Dama contested to some extent whether the criminal acts were actually burglaries or some lesser crime.

17

really." When pressed, Palacios admitted that she shared a note about the testimony of Dr. Aptman (damage expert of Dama), specifically that scars on the body are not considered disfigurement, only scars on the face. She asserted that this was all that was discussed, and not any follow-up or her opinion about that testimony. She was confident about that. Juror Livia Guerra told the court that Palacios showed her a note about the doctor's salary, but didn't remember Palacios showing her a note about disfigurement. The information about the doctor's salary, Juror Guerra stated, did not influence her judgment on the case. Finally, Juror Michael Oviedo Davila told the court Palacios passed a note about "scars" or "surgery that one of the doctors was talking about in the video." He said that Palacios asked him what the surgery was about but he didn't answer her.

The trial court offered to strike the alternate juror Palacios, but counsel for Dama said he didn't think that was "really the remedy." He objected to striking her because "it does not cure the harm and prejudice that has clearly been shown by pre-forming opinions about a doctor and mid-trial discussions amongst jurors when that's completely inappropriate." He moved for a mistrial, but the trial court denied the motion.

The court then questioned the entire jury panel, one at a time, and all but the three discussed above indicated they had not seen the contents of

18

any notes being passed nor had any discussion about the evidence. At the conclusion of the inquiry, the trial court, based upon the jurors' answers as well as the trial court's personal observations during the inquiry, determined that the alleged misconduct created "no reasonable possibility of affecting the verdict," that Dama suffered no prejudice, and that any presumed prejudice had been rebutted. Counsel for Dama asked the judge to read the deliberation jury instruction again and asked the judge to tell the jurors to disregard any comments heard from other jurors, and that they need to wait until all of the evidence is presented. The court did so, and re-instructed the jury, in part, as follows:

> Folks, this is one of the original instructions [read at the beginning of the trial]. You must pay close attention to the testimony and other evidence as it comes into the trial. However, you must avoid forming any final opinion or telling anyone else your views on the case until you begin your deliberations. This rule requires you to keep an open mind until you have heard all of the evidence and it is designed to prevent you from influencing how your fellow jurors think until they've heard all the evidence and had an opportunity to form their own opinions. The time and place for coming to your final opinions and speaking about them with your fellow jurors is during deliberations in the jury room after all of the evidence has been presented, after the closing arguments have been made and after I have instructed you on the law. It is important that you hear all of the facts and that you hear the law and how to apply it before deciding anything.
>       . . .
>
> When we are in a recess, do not discuss anything about the trial or the case with each other or with anyone else. Only you get to deliberate and answer the verdict questions at the end of the trial.

Even so, Dama's counsel contended, this could not cure the prejudice.[9]

After trial, Dama moved for new trial due to the juror misconduct issue, asserting the jurors engaged in preliminary deliberations through improper communications during trial, which is presumptively prejudicial. The trial court denied the motion, finding the juror note was "an isolated request for information," and reaffirming that any presumption of prejudice was rebutted by the court's interviews of the jurors.

"When juror misconduct is established, 'the moving party is entitled to a new trial *unless* the opposing party can demonstrate that there is no reasonable possibility that the juror misconduct affected the verdict.'" Green v. State, 397 So. 3d 73, 74 (Fla. 4th DCA 2024) (citations omitted). In short, we must first determine whether Dama established that there was juror misconduct. If there was, a presumption of prejudice arises, which, if not

---

[9] Dama also requested that the court "impound" the juror notebooks of the "offending jurors" and for a view of a portions of the jurors' notes that might relate to the alleged misconduct. The court agreed to preserve the notebooks, but denied Dama's request to view portions of the jurors' notes. We find no abuse of discretion in the trial court's ruling, especially in light of the standard jury instruction read to the jury at the commencement of the trial, assuring them that "after you've completed your deliberations the bailiff will deliver your notes to me. They will be destroyed.  No one will ever read your notes."

rebutted, would require a new trial. Two cases from the Florida Supreme Court provide helpful context for our discussion of this issue.

In Johnson v. State, 696 So. 2d 317 (Fla. 1997), the defendant argued the trial court had erred in failing to declare a mistrial after it was revealed that jurors had improperly communicated with one another. Specifically, one juror admitted that she discussed with another juror her confusion about all the names and nicknames in the case and another admitted the jurors had spoken about "the person that got shot. We said it was pretty traumatic, the bullet wounds on him. We discussed other matters, like the doctor's opinion, it was really interesting hearing the way he talked and how he explained things real well." Johnson, 696 So. 2d at 321-22. That same juror also said that he had discussions with another juror that the defendant had "admitted his guilt in a way," by signing a confession and that they wished they could ask questions, but he was clear that none of the jurors had formed a premature opinion about the defendant's guilt. Id. The Johnson Court held that these types of discussion "clearly indicate[] an impropriety" by the jurors. Id. at 323. Thus, the Court found "a prima facie case of potential prejudice" had been established, requiring a determination of whether that presumption was rebutted. Id.

In Amazon v. State, 487 So. 2d 8 (Fla. 1986), two jurors saw a news story about the trial on a muted television, while they were sequestered, which played a videotape of a state witness' testimony and one of the jurors commented that the witness's testimony was "impressive." The court found this "establishes a prima facie case of potential prejudice." Id. at 12.

In the present case, we conclude that the notes passed between jurors was improper and assume for our discussion that this constituted "juror misconduct" as that term is generally understood. Even if Juror Palacios was simply asking for "clarification" about what the doctor testified to at trial, the law is clear that jurors should not discuss the testimony or other evidence of the case prior to deliberations. Johnson, 696 So. 2d at 323 ("It is axiomatic that jurors should not discuss a case among themselves prior to deliberations.").

Given this conclusion, prejudice is presumed and a new trial would be warranted unless that presumption of prejudice is rebutted by the record.

In Johnson, there were several instances of juror discussion which warranted individual treatment by the Court in assessing the issue of prejudice. For example, in the discussion between jurors regarding their confusion about nicknames being used in the case, the Johnson Court held that the juror was not commenting or asking for comment on evidence, but

simply asking for information, and although this was "still improper," "it is incredible to assert that such a question could influence the outcome of the trial," and thus, the Court found there was no prejudice. Johnson, 696 So. 2d at 323-24.

As for the juror discussion regarding the doctor's testimony about the "traumatic" nature of the wounds, again, the Court found this was improper juror communication, but not prejudicial because "their discussion could not have conceivably influenced the result." Id. at 324. Specifically, the Court noted that the comments were merely a reaction to the doctor's testimony about the victim's wounds and there was "no indication that any extrinsic information was imparted to the jury." Id. The Court admonished "we must stop short of finding all human errors to be prejudicial to the defendant." Id.

Finally, as to the juror discussion about apparent confusion regarding the defendant's confession, the Court again acknowledged this was improper, but once more found no prejudice to the defendant, concluding that the record rebutted such presumption of prejudice because the juror noted that they all agreed to keep an open mind despite their confusion. Id.

In Amazon, 487 So. 2d at 12, the court held that the prejudicial nature of a statement of one juror to another that a witness' testimony had been "impressive" was rebutted because the "sound was off, so the jurors were

not exposed to prejudicial verbiage, and the brief footage of the witness, which merely reprised what the jury had seen for itself that day, cannot conceivably have influenced the result."

Similar to that in <u>Johnson</u> and <u>Amazon</u>, the presumption of prejudice in the instant case was rebutted by the trial court's questioning of the jurors and the explicit instructions given by the court thereafter. Juror Palacios was clear that she asked only about the doctor's testimony for clarification, and that she had not prejudged the case. Neither of the jurors with whom she communicated indicated there was any prejudging of the case. These communications fail to rise even to the level of <u>Johnson</u> or <u>Amazon</u> and, like those cases, do not warrant a new trial. <u>See also</u> <u>Scott v. State</u>, 619 So. 2d 508 (Fla. 3d DCA 1993).

Finding no error in any of the remaining issues raised on appeal, we affirm.

Affirmed.